**ADLER PAPER STOCK, INC., Appellant,**

v.

**HOUSTON REFUSE DISPOSAL, INC., Appellee.**

No. 01–95–00914–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 22, 1996.

Thomas McQuage, Galveston, for Appellant.

Dion D. Raymos, Clifton J. McAdams, Houston, for Appellee.

Before TAFT, HUTSON–DUNN and O'CONNOR, JJ.

## OPINION

TAFT, Justice.

Appellant, Adler Paper Stock, Inc. (Adler Paper), appeals from a take-nothing judgment rendered in favor of appellee, Houston Refuse Disposal, Inc. (Houston Refuse). After a three-day jury trial, the case was submitted to the jury to determine whether Houston Refuse violated the Deceptive Trade Practices and Consumer Protection Act (DTPA) in connection with a lease agreement between Adler Paper and Houston Refuse. On appeal, Adler Paper asserts the jury's failure to find Houston Refuse in violation of the DTPA was against the great weight and preponderance of the evidence. We affirm.

### Facts

The commercial property made the subject of the lease between Adler Paper and Houston Refuse was owned by Adler Paper and was used at one time as a recycling facility. The property had been vacant for many years, allowing it to become an illegal dumping ground for used tires and other trash.

On April 10, 1989, the City of Houston initially notified Adler Paper that the property had become a public health nuisance and informed Adler Paper to clean the premises by May 1, 1989, or the City would clean it and place a lien on the property. Adler Paper took no action.

On September 1, 1989, the City notified Adler Paper that a hearing would be conducted on September 28, 1989, to determine whether the buildings on the property constituted a hazard to the health, safety, or welfare of its occupants or citizens of the City.

No representative of Adler Paper was present at the hearing, and a demolition order was signed by the City on October 4, 1989. The order required Adler Paper to provide written notice of its intention to repair, secure, or demolish and remove the building no later than October 29, 1989. Furthermore, Adler Paper was to either secure the building by December 29, 1989, repair the building by January 31, 1990, or demolish and remove the building by January 31, 1990. If Adler Paper failed to undertake and complete one of the options by the corresponding deadline, the City would be authorized to demolish and remove the building, forwarding the costs to Adler Paper. The property continued on a course of disrepair through March 20, 1990.

Sometime in March, Adler Paper, through its representative, Donald Katz, began negotiating a lease for the subject property with Joe Boyd, President of Houston Refuse. A lease was executed by Katz and Boyd effective May 1, 1990. The lease provided a term of three years rent free. In return, Houston Refuse agreed to secure the property and remove the tires, trash, and other debris from the property (at an estimated cost of $33,000). The lease included a three-year option at $12,000 per year to begin at the expiration of the primary term.

Although Katz knew of the City's impending demolition order, he did not inform Boyd of the order at any time prior to executing the lease. Soon after the lease was executed, however, Boyd found out about the order from a colleague.

Once knowledge of the impending demolition was out in the open, both Adler Paper and Houston Refuse attempted to delay it through various channels. On May 28, 1990, Boyd wrote a letter to the City providing eight steps Houston Refuse was taking to secure and improve the property.

1. Secure gate and entire perimeter with 6 ft. cyclone steel fencing. Later barbed wire around the top of fence perimeter.

2. Clean up of over 240 cubic yards of trash scattered over the entire lot. Clean up the debris on the ditch in front of the lot, including various tires.

3. Stack all tires inside the building or shed building on theleft [sic] and fumigate with approved insecticide.

4. Remove over 36,000 tires and shred and deliver to approved Security Landfill Hwy 105 Conroe, Texas upon removal of the demolition order. This should save the city over $60,000.

5. Install lighting in the large baler building on the right.

6 Install lighting and improve the appearance of the smaller building on the left.

7. Install a city code office or portable building to the immediate right of the gate entrance for office personnel.

8. Install a$100,000 [sic] plus baler to recycle cardboard and other materials in the large building.

The City responded on June 20, 1990, that a demolition contract had already been consummated; however, if all steps outlined in Boyd's May 28, 1990, letter were completed prior to the issuance of the proceed order, the demolition would be halted.

On June 8, 1990, an attorney hired by Katz to pursue appropriate legal channels with the City wrote to Katz explaining that the City had agreed to delay the demolition to give Adler Paper and Houston Refuse an opportunity to bring the facility up to code standards. The letter to Katz further explained that the attorney spoke with Boyd, advising him that he should obtain copies of the specifications from the dangerous buildings office so that he would know exactly what needed to be done to forestall the demolition; according to the letter, Boyd said he would do so. However, Boyd testified that he was out of town during this alleged conversation and denies ever having had it. Additionally, Boyd claims he never received a copy of the attorney's letter until after this suit was filed. The attorney who wrote the letter had no personal recollection of the entire transaction; he could not recall whether he had this conversation with Boyd or that he sent a copy of the letter to Boyd.

In early May, Houston Refuse began work on the property. Utilizing a bobcat, a dumpster and two employees, Houston Refuse removed approximately 2,000 tires and most of the trash and debris. Additionally, a new fence was installed around the property. Sometime in September, however, the City informed Houston Refuse it was going through with the demolition order and advised Houston Refuse to remove its equipment from the property or it would be demolished as well.

Adler Paper did not know of the demolition until November 4, 1990, when Katz drove by the property while he was in Houston on business. The buildings and trash were gone; all that remained on the property were a few tires. Additionally, Houston Refuse had abandoned the property.

Adler Paper brought suit, and the case was submitted to the jury on an alleged DTPA violation. The trial court entered a take-nothing judgment in accordance with the jury verdict. Adler Paper filed a motion for new trial which was denied and Adler Paper appealed. On appeal, Adler Paper invokes this Court's jurisdiction to review the factual sufficiency of the jury's failure to find a violation of the DTPA.

### Factual Sufficiency

In its sole point of error, Adler Paper argues that the trial court erred by overruling its motion for new trial because the jury's failure to find Houston Refuse committed a deceptive trade practice was against the great weight and preponderance of the evidence. Adler Paper's sole argument in support of this contention is that Boyd's May 28, 1990, letter outlined eight steps it would take to secure and improve the property that would satisfy its obligations under the terms of the lease agreement.[1] Adler Paper contends it relied on Houston Refuse's obligations to secure and improve the property

---

1. Under the terms of the lease agreement, Houston Refuse agreed to "clean property of debris, garbage and tires and properly dispose of same" and "upon termination of this lease to return property in good condition free of all debris, garbage and tires." Furthermore, "Lessee acknowledges that from time to time it will make improvements to the property such as building fences and remodeling buildings."

to forestall the City's action. Because these steps were not carried out and the City demolished the buildings and removed the remaining tires and trash, Adler Paper claims Houston Refuse committed deceptive trade practices against Adler Paper.

Houston Refuse admits it was to secure, clean, and improve the property as outlined in its May 28th letter; however, Houston Refuse contends these obligations were to be satisfied within the three-year term of the lease. At the time the lease was consummated, Houston Refuse did not know of the pending demolition order and did not know time was of the essence with respect to the clean-up. Because the City went ahead with the demolition order, Houston Refuse did not have time to carry out its obligations. Furthermore, because neither the lease agreement nor Boyd's May 28th letter specified when these steps would take place, Houston Refuse contends it could not have committed a deceptive trade practice. We agree.

## A. Standard of Review

■ Only one standard of review is used in reviewing factual insufficiency challenges. *M.J. Sheridan & Son v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). An appellate court must consider all the evidence and set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ). However, an appellate court cannot substitute its judgment for that of the trier of fact and determine that it would reach a different conclusion based upon the evidence. *Glockzin v. Rhea*, 760 S.W.2d 665, 666 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

## B. DTPA

It is a violation of DTPA section 17.46(b)(12) for a party to represent that an agreement confers or involves rights, remedies, or obligations which it does not have or involve. TEX.BUS. & COM.CODE ANN. § 17.46(b)(12) (Tex.UCC) (Vernon Supp. 1996). The underlying purpose of the DTPA is to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty. TEX.BUS. & COM.CODE ANN. § 17.44 (Tex. UCC) (Vernon Supp.1996); *West Anderson Plaza v. Feyznia*, 876 S.W.2d 528, 532 (Tex. App.—Austin 1994, no writ).

■ There appear to be three schools of thought as to what standard courts should use to decide whether statements about contractual rights and obligations fall within the ambit of section 17.46(b)(12). One court has held that a cause is actionable under section 17.46(b)(12), absent evidence of overreaching or victimizing, when a party makes "factual" representations that prove to be false; "interpretive" representations that prove to be false would not be actionable. *See Group Hospital Servs., Inc. v. One & Two Brookriver Ctr.*, 704 S.W.2d 886, 888–89 (Tex.App.—Dallas 1986, no writ). The great weight of the evidence does not establish that Houston Refuse made a false factual representation concerning its obligations under the lease. Houston Refuse did not represent that it would secure and improve the property within a specific time period in order to forestall the demolition ordered by the City. In fact, at the time the lease was consummated, Houston Refuse did not have knowledge of the impending demolition order. Nevertheless, neither the lease agreement nor Boyd's May 28th letter provides a specific time frame in which to carry out the improvements.[2] It can be inferred, however, that the

---

2. The only portion of the lease agreement which alludes to any time frame to carry out improvements is in the addendum which provides that the "lessee acknowledges that from *time to time* it will make improvements to the property." (Emphasis added.) The only indication of when improvements would be carried out according to Boyd's May 28th letter is in step 4, which provides that Houston Refuse will "[r]emove over 36,000 tires and shred and deliver to approved Security Landfill Hwy 105 Conroe, Texas upon removal of the demolition order." Because the record indicates the demolition order was never removed, the failure to perform this step did not render the statement a misrepresentation. Furthermore, where the record is devoid of evidence providing a definite time period in which to perform a task, there can be no misrepresenta-

improvements were to be carried out within the three-year primary term of the lease. Thus, any statements by the parties as to a specific time frame can only be construed as being "interpretive."[3]

Another court has held that incorrect representations concerning an unambiguous provision may be actionable, while such representations concerning an ambiguous provision are not actionable. *See Quitta v. Fossati,* 808 S.W.2d 636, 644–45 (Tex.App.—Corpus Christi 1991, writ denied). Because neither the lease agreement nor the May 28th letter specifically state when the improvements were to be completed, *when* they were to be completed is ambiguous. Thus, any statement as to this period is nonactionable under the reasoning of the *Quitta* court.

 Appellant contends we should follow the *Feyznia* court and view the totality of the circumstances to determine whether Houston Refuse's representations in its May 28th letter are actionable under section 17.46(b)(12). We agree. Under the *Feyznia* standard we consider all relevant factors, including:

1. Whether the representation was clearly factual, clearly interpretive, or some less clear combination of the two;

2. Whether the relevant contractual language was ambiguous or unambiguous;

3. Whether the parties were in a substantially equal position of knowledge and information;

4. Whether there was evidence of overreaching or victimizing;

5. Whether there was evidence of unconscionable conduct; and

6. Whether there was a confidential or fiduciary relationship between the parties.

*Feyznia,* 876 S.W.2d at 533.[4]

The first and second factors have already been resolved above. Additionally, the par-

ties were in substantially equal positions of knowledge and information. Both parties were in contact with the City. The City sent all notices to Adler Paper, and Adler Paper hired an attorney who should have kept it informed of transpiring events. Thus, Adler Paper cannot argue that Houston Refuse had superior knowledge. Furthermore, the record cannot support a contention that Houston Refuse's conduct was overreaching, victimizing, or unconscionable; nor can it be said that a confidential or fiduciary relationship existed between the parties. Thus, even under the totality of the circumstances standard, Adler Paper cannot establish the jury's finding as being so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

Accordingly, we overrule Adler Paper's sole point of error and affirm the trial court's judgment.

---

tion for purposes of a DTPA violation. *See John Morrell & Co. v. Frozen Food Exp., Inc.,* 700 F.2d 256, 259 (5th Cir.1983).

**3.** The record contains various statements by both parties as to when the improvements were to be carried out. However, "Penalizing the expression of reasonable and honestly held opinions regarding the meaning of contract language goes far beyond protecting consumers against false,

misleading, and deceptive business practices and was not intended by the legislature." *Feyznia,* 876 S.W.2d at 532.

**4.** Although we follow the totality of the circumstances standard outlined by the *Feyznia* court, we emphasize that the factors listed are not exhaustive.