**FROST NAT. BANK f/k/a National Bank Of Commerce, Appellant,**

v.

**Mary HEAFNER, Appellee.**

**No. 01–98–01384–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 2, 1999.

Rehearing Overruled Jan. 20, 2000.

David M. Gunn, Houston, Brennan T. Holland, San Antonio, for Appellant.

Daryl L. Moore, Houston, for Appellee.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE.*

## OPINION

MICHOL O'CONNOR, Justice.

Frost National Bank f/k/a National Bank of Commerce (Frost), the defendant below and appellant here, appeals from a jury verdict in favor of Mary Heafner, the plaintiff below and appellee here. We affirm in part and reverse in part.

---

\* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

## Factual Background

Heafner is a Houston attorney who maintains several bank accounts in the Houston area. Heafner maintained a personal money market account at Frost[1] and her firm's operating account at Bank United.

In 1991, Heafner represented Duane Lavely in several lawsuits. Because he could not always afford to pay her, she allowed him to run errands, do yard work, and make repairs on her office and rental property. In 1992, Heafner taught Lavely how to serve process and subpoenas, skip trace, and use the computer. Lavely was allowed to use her office equipment in his new business. In return, he occasionally answered her telephones and helped with other errands around her office.

When Heafner later became too sick to go into the office, she would call Lavely at the office, review bills with him, and authorize him to pay certain bills by signing her signature to the Bank United checks. She did not authorize Lavely to sign her name to checks on the Frost account or any other bank account.

When Heafner returned to work, she discovered discrepancies in her Bank United operating account. She asked Lavely to vacate her offices. Heafner met with Bank United to discuss the discrepancies, and she distinguished the checks Lavely was authorized to write for her office expenses from those he wrote for his own use. Heafner signed forgery affidavits on the checks Lavely wrote for himself, but she did not sign forgery affidavits on the checks he wrote for her benefit. Despite the forgeries, Heafner decided not to sue Bank United, because she thought it would be unfair to hold Bank United responsible for determining which checks she had actually given Lavely authority to sign on her behalf.

---

1. Heafner opened her account at National Commerce Bank (NCB), which later merged into Frost. As part of the merger, Frost assumed NCB's liabilities.

Heafner also discovered that Lavely forged her signature on two $5,000 checks on her Frost account, which he deposited into Heafner's Bank United account over a forged endorsement. Heafner reported the forgeries to Frost, where she met with Tina Veserra, head of Frost security. Heafner told Veserra that the signature and endorsement on both $5,000 checks were forged. Veserra agreed the signatures were forgeries. Heafner admitted that both $5,000 checks were deposited into her Bank United account.

Heafner sued Frost, alleging the following causes of actions:

1. Breach of contract and violation of the Texas Deceptive Trade Practices Act, alleging Frost breached the deposit account agreement and violated the warranties contained in the agreement.

2. Negligence, alleging Frost breached its duty of care by allowing $10,000 to be withdrawn from her money market account, not comparing the signatures on the checks to her signature on the account signature card, not following its own rules and policies, and not exercising ordinary care to determine whether the checks were authorized transactions.

3. Spoilation of evidence, alleging Frost intentionally or negligently spoiled evidence of the forgeries and interfered with a prospective civil action on Heafner's part against Lavely.

4. Breach of the duty of good faith, alleging, among things, that Frost did not inform her of its investigation into the forgeries and did not cooperate with her in pursuing criminal charges against Lavely.

Heafner asked for actual and punitive damages.

The jury found that Frost knowingly engaged in false, misleading, or deceptive acts or practices, committed fraud against Heafner, and did not comply with the deposit account agreement. Heafner was awarded $18,488, plus interest in actual damages; $400,00 in exemplary damages; and attorney's fees. This appeal by Frost followed.

## Damages

In issue one, Frost asserts the evidence is legally and factually insufficient to support the jury's findings on causation under her theories of breach of contract, violation of the DTPA, and fraud.

### Waiver of complaint

■ Heafner asserts that Frost has waived its argument about causation because Frost's complaint focuses on whether its breach of the deposit account agreement was the "cause-in-fact" of Heafner's injuries. Heafner contends her injuries "resulted from" Frost's breach.[2]

On appeal, Frost contends there is no evidence that its breach of the deposit account agreement was the cause-in-fact of Heafner's injury. Frost's issue on appeal is sufficient to challenge all causation findings. See Tex.R.App. P. 38.1(e); see also Bransom v. Standard Hardware, Inc., 874 S.W.2d 919, 923 (Tex.App.—Fort Worth 1994, writ denied) (holding that complaints of legal and factual insufficiency to support a particular finding, and challenges directed against any legal conclusions based upon the finding, may be combined under a single point of error raising both contentions). Therefore, Frost did not waive its complaint on appeal.

---

2. The jury was asked three questions on the breach of contract issue: (1) did Frost fail to comply with the deposit account agreement, (2) was Frost's failure to comply excused, and (3) what sum of money would fairly and reasonably compensate Heafner "for her damages, if any, that resulted from such conduct." These questions conform with the Texas Pattern Jury Charges. See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—Business, Consumer & Employment PJC 101.2, 101.21, 110.2 (1998).

*Proof of causation*

■ When both legal sufficiency and factual sufficiency points of error are raised on appeal, we address the legal sufficiency point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *Neese v. Dietz*, 845 S.W.2d 311, 312 (Tex.App.—Houston [1st Dist.] 1992, writ denied). In reviewing a legal insufficiency point, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988); *Neese*, 845 S.W.2d at 312. If there is any evidence of probative force to support the finding, we overrule the point and uphold the finding. *Sherman*, 760 S.W.2d at 242; *Neese*, 845 S.W.2d at 312. That is, if there is more than a scintilla of evidence, we will not overturn the jury's findings. *Sherman*, 760 S.W.2d at 242.

In reviewing a factual insufficiency point, we consider and weigh all of the evidence; we will set aside the verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Neese*, 845 S.W.2d at 313. We will not substitute our opinion for that of the trier of fact. *Neese*, 845 S.W.2d at 313.

Frost does not challenge the jury finding on breach of contract. Instead, Frost contends its breach merely created a condition that made any injury suffered by Heafner possible. Frost argues there is no evidence its actions caused Heafner's injuries because the $10,000 went into Heafner's business account at Bank United. Frost relies on *Davis Aircraft Prods. Co. v. Bankers Trust Co.*, 36 A.D.2d 705, 319 N.Y.S.2d 379 (1971), for the proposition that, when a person's money is taken from their account at one bank and deposited into their account at another bank, that person does not suffer any legal injury.[3] We disagree.

■ It is clear that Frost is liable for damages caused to Heafner resulting from the forgeries. Section 4.401 of the Texas Business and Commerce Code sets forth the general rule that a bank may only charge against a customer's account an item properly payable from that account. *See* Tex. Bus. & Com.Code § 4.401; *see also Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 (Tex.1979). Section 3.404 provides that a person is not liable on an instrument until she has signed the instrument, and any unauthorized signature is wholly inoperative as that of the person whose name is signed. *See* Tex. Bus. & Com.Code § 3.404(a); *see also McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183, 187 (Tex.App.—Dallas 1989, no writ). Therefore, under the Business and Commerce Code, a bank is conclusively presumed to know the signature of a depositor and may not charge the depositor's account with amounts of any checks not signed by the depositor, no matter how artistic the forgery and regardless of whether the bank was negligent. *See McDowell*, 772 S.W.2d at 188; *see also Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex.1984) (holding that a bank that pays funds in breach of a contract on a missing endorsement is liable for the face amount of the instrument).

**3.** In *Davis*, the plaintiff maintained a checking account with Bankers Trust that required two signatures on checks drawn on the account. Over a period of years, the plaintiff's comptroller signed the checks but forged the signature of another officer. The checks were then deposited into the plaintiff's account at Security National Bank. The court determined that the plaintiff's loss was not caused by Bankers Trust's payment of the checks. *Id.* at 705, 319 N.Y.S.2d 379. Instead, the plaintiff's loss "was the result of manipulations with regard to plaintiff's Security account, over which defendant had no control. Since plaintiff initially received the proceeds of the checks which defendant paid, it suffered no loss which is recoverable from defendant." *Id.*

Heafner opened her money market account at Frost as a retirement account. When she opened the account, she was given several temporary checks that did not have her name or address pre-printed on them. She never ordered any checks for the account. The two forged $5,000 checks were the temporary checks. When the checks were presented to Frost (in June and July respectively), Frost did not verify that the signature on the checks was Heafner's. Heafner testified that, if she had known about the first forged $5,000 check in June, she would have acted immediately to limit her damages. Instead, she did not discover the two forgeries until August 1994. By that time, Lavely had written several thousand dollars in unauthorized checks from the Bank United account during June, July, and August of 1994.

 Frost attempts to escape liability by asserting Heafner's injuries were caused by Heafner herself, Bank United, and Lavely. Frost presented evidence that some of the checks written on the Bank United account after the deposit of the two $5,000 checks were authorized by Heafner and were for her benefit. Heafner testified that checks were written for what she believed to be her business expenses, but that she later discovered were Lavely's expenses. This evidence is legally sufficient to prove that Frost's breach of the account deposit agreement was the cause-in-fact[4] of Heafner's injuries. Moreover, this evidence does not amount to evidence of such great weight and preponderance as to make the jury's finding clearly wrong and unjust.

*Proof of foreseeability*

 Frost also asserts Heafner did not prove foreseeability because Heafner's injuries were too remote or speculative

4. Cause-in-fact means that the defendant's act or omission was a substantial factor in bringing about the injury that would not otherwise have occurred. *Union Pump Co. v. Allbritton,*

based on its payment of the two forged checks. We disagree.

In *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981), the Supreme Court cited *Hadley v. Baxendale*, 9 Exch. 341 (1854), for the following proposition:

Where two or more parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally; i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach.

Therefore, Heafner had to prove her damages either arose according to the usual course of things from the breach of the deposit account agreement, or were reasonably in the contemplation of the parties at the time they made the contract as the probable result of the breach. Heafner's testimony establishes that the $10,000 deposit into her Bank United account enabled Lavely to steal several thousand dollars from her by writing unauthorized checks for his benefit on the Bank United account or by Heafner's paying what she thought to be her business expenses that later proved to be expenses incurred for Lavely's benefit.

Losses resulting from a deposit of money into another bank account that would not have been possible if the payee bank had not paid the forged checks are reasonably within the contemplation of payee banks.

*Consequential damages*

 Frost argues there is no evidence to support the jury's award of consequential damages. The jury was asked what

898 S.W.2d 773, 776 (Tex.1995) (discussing proximate cause and producing cause in context of personal injury case).

amount would compensate Heafner for loss of the benefit of the bargain, and awarded her $10,000. Frost does not assert Heafner was not entitled to loss of benefit of the bargain.[5]

The jury was also asked to determine "the reasonable and necessary expenses actually incurred by [Heafner] as a result of the conduct in question ..." and awarded her $3,500. The account deposit agreement expressly provides that Frost was not liable for consequential damages; therefore, Heafner was not entitled to an award of $3,500 in consequential damages.

We sustain issue one as to the award of $3,500 in consequential damages, and we overrule issue one in all other respects.

### Recovery under the DTPA

In issue two, Frost asserts the jury's finding that it engaged in false, misleading, or deceptive acts or practices that were the producing cause of Heafner's injuries was improper because Heafner's DTPA claim is nothing more than a mere breach of contract claim. Frost does not assert that the evidence is legally or factually insufficient to support a finding that it violated the DTPA. Frost relies on *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex.1996), for the proposition that Heafner may not repackage her breach of contract claim into a violation of the DTPA claim.

It is a violation of DTPA section 17.46(b)(12) for a party to represent that an agreement confers or involves rights, remedies, or obligations it does not have or involve. Tex. Bus. & Com.Code § 17.46(b)(12); *see also Adler Paper Stock, Inc. v. Houston Refuse Disposal, Inc.*, 930 S.W.2d 761, 764 (Tex.App.—Houston [1st Dist.] 1996, writ denied). The underlying purpose of the DTPA is to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty. Tex. Bus. & Com.Code § 17.44; *see also Adler*, 930 S.W.2d at 764.

■ Heafner contends she is not precluded from bringing a DTPA claim because Frost did more than merely breach the deposit account agreement. Under her breach of contract claim, Heafner alleged Frost breached the deposit account agreement when it paid the two forged checks and by not following its error-resolution procedures. Under her DTPA claim, Heafner alleged Frost misrepresented the safety and security of deposited funds, safeguards to prevent unauthorized withdrawals, and the attributes of the services it offered. These assertions amount to nothing more than a complaint that Frost did not comply with the terms of the deposit account agreement and, if true, Frost's actions contrary to these representations result only in a breach of contract claim.

■ Heafner also alleged that, after Frost paid the two forged checks, Frost claimed it had the right not to return her money because, according to Frost, she benefitted from the funds when the forged checks were deposited into her Bank United account. She also contended Frost misrepresented her rights to share in the

---

5. At common law, actual damages can be either "direct" or "consequential." *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997). "Direct damages," also known as "general damages," compensate for the loss, damage, or injury that is conclusively presumed to have been foreseen or contemplated by the party as a consequence of his breach of contract or wrongful act. *Henry S. Miller*, 836 S.W.2d at 163. One measure of direct damages is the

"benefit of the bargain" measure, which utilizes an expectancy theory, evaluating the difference between the value as represented and the value actually received. *Id.*

On the other hand, "consequential damages," also known as "special damages," are those damages that result naturally, but not necessarily, from the acts complained of. *Id.* Under the common law, consequential damages are not recoverable unless the defendant had notice that the plaintiff would suffer such damages. *Id.*

results of Frost's investigation into the forgeries. These assertions amount to nothing more than a complaint that Frost did not comply with the terms of the deposit account agreement and, if true, Frost's actions contrary to these representations result only in a breach of contract claim. *See Crawford*, 917 S.W.2d at 14–15 (allegation of mere breach of contract, without more, does not constitute a "false, misleading or deceptive act" in violation of the DTPA).

We sustain issue two.

### Recovery for Fraud

In issue three, Frost asserts the evidence is legally and factually insufficient to support the jury's finding of fraud.

A fraud cause of action requires (1) a material misrepresentation, which was false, and (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Id.* at 48. However, the mere failure to perform a contract is not evidence of fraud. *Id.* Therefore, Heafner was required to present evidence that Frost made representations with the intent to deceive and with no intention of performing as represented. The evidence must be relevant to Frost's intent at the time the representations were made. *Id.*

While a party's intent is determined at the time the party made the representation, it may be inferred from the party's actions after the representation is made. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). Because intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* at 435. "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.*

It is within the jury's province to draw reasonable inferences from the evidence. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex.1997). If a jury is to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts. *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.). It is not enough that the facts raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. *Texas Dep't of Corrections v. Jackson*, 661 S.W.2d 154, 157 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). However, when circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Gardiner*, 859 S.W.2d at 400. Thus, the circumstantial evidence upon which Heafner relies must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the nonexistence of the ultimate fact. *Id.* at 401.

Heafner contends the evidence is legally and factually sufficient to support the following fraudulent misrepresentations. Heafner contends that, when she opened her money market account at Frost, Frost falsely represented to her that it would not release her money without her authorization, her money would be kept "safe and secure in the bank," and it would "compare the signature" on proposed withdrawals before releasing any funds from her account. Even if Frost made these representations to Heafner, there is no direct evidence in the record that Frost intended to deceive Heafner when it made them to her.

Heafner argues that Frost's later actions prove its fraudulent intent based on

the following circumstantial evidence: Frost did not compare the signature on the forged checks to her signature card at the bank, Frost's bookkeeper did not report the forgeries to her supervisor, Frost paid the two forged checks, Frost induced Heafner to sign forgery affidavits that it later altered to recover her money, Frost denied knowledge of the alteration on the affidavits, Frost did not immediately tell Heafner it received a $10,000 credit from the Federal Reserve, Frost did not return the money to her account after it received the Federal Reserve credit, and Frost investigated the forgeries but did not tell her about its decision to not return the money. Heafner also contends Frost did not disclose that it interpreted the deposit account agreement to contain a "benefit" exception that might relieve Frost of liability for paying on forged signatures.

Heafner said that when she reported the forgeries to Frost, she was told Frost would return the money to her account, investigate the forgeries, and report back to her. When Heafner went to Frost to report the forgeries, Veserra had someone prepare a forgery affidavit for each check, which stated in part:

> That the purported signature/endorsement of Mary Heafner is in fact a forgery and is not the signature/endorsement of this affiant; that affiant gave no one authority to negotiate said check, and that the signature/endorsement on said check was not put thereon through connivance of this affiant with any person or persons; and that this affiant has not received the proceeds nor any benefit from the proceeds of said check.

Neither Heafner nor Veserra circled the word "endorsement" or "signature" on the affidavits. Although Heafner signed both affidavits, neither was notarized in her presence. Heafner later discovered that the word "endorsement" had been circled.

Veserra admitted the two checks were forgeries and that someone in Frost's bookkeeping department made a mistake by paying the checks. She said that either "endorsement" or "signature" or both had to be circled to indicate whether one or both were forged. Veserra claimed she did not know which word would be circled when Heafner signed the affidavit. She denied "altering" the affidavits, saying instead, that she merely "completed" them. Veserra said that by circling only the word "endorsement" (instead of both "endorsement" and "signature") she was attempting to shift any loss to Bank United.

When Veserra returned the checks to Bank United, she returned them via the Federal Reserve Bank "without entry." She explained that, when one bank returns a check to another bank, the notation "without entry" means the Federal Reserve should not credit the bank returning the check until a determination is made as to which bank should be credited. Veserra did not initially know the Federal Reserve had credited Frost's account with the $10,000, but she explained that the credit was a mistake because of the "without entry" notation. She said Frost did not deposit the money into Heafner's account after discovering the Federal Reserve credit because she knew it was a mistake and the credit would be reversed. She said that if the credit to Frost's account had not been a mistake, then the money would have been deposited into Heafner's Frost account.

Veserra admitted she did not immediately tell Heafner about the Federal Reserve credit or that Frost would not return the $10,000 to her account after the credit was reversed. However, a few days later, she did tell Heafner that Frost would not return the money because the two checks were deposited into Heafner's Bank United account. She did not offer any further explanation to Heafner because she did not think it was necessary for Heafner to know all the adjustment procedures a bank must go through when a check has been forged.

Veserra said the two checks were initially sent to Bank United to verify they had

been deposited into an account actually owned by Heafner. She said when she determined the money went into Heafner's Bank United account, her investigation ended because she concluded Heafner benefitted from the deposit.

 We do not find that the facts upon which Heafner relies, Frost's silence regarding its internal investigation and its adjustments with Bank United and the Federal Reserve coupled with its refusal to pay Heafner $10,000, have probative force sufficient to constitute a basis of legal inference of fraud. These facts are equally consistent with the theory that Frost's actions were motivated simply by its desire to shift any loss to Bank United and that Frost believed Heafner did not lose any money because both forged checks were deposited into her Bank United account. Because the inferences drawn from the evidence equally support a different theory, the evidence is legally insufficient to support the finding of intent in Heafner's theory of fraud.

We sustain issue three.

### Punitive Damages

In issue five, Frost asserts the jury's award of $400,000 in punitive damages should be either reduced or deleted because (1) punitive damages are improper without actual damages, independent tort damages, or malice; and (2) the punitive damages are excessive under common law standards and the Due Process clause of the United States and Texas Constitutions.

 A breach of contract alone will not support punitive damages; an independent tort must be established. *Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995). Because we sustain points of error two and three, Heafner is not entitled to a punitive damage award.

We sustain issue five.

### Stacking Damages

In issue four, Frost asserts that awarding Heafner both attorney's fees and punitive damages improperly stacked contract damages on top of tort damages.

 Heafner was entitled to an award of attorney's fees under her breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001. Because we sustain issue five, we need not address whether the award of both attorney's fees and punitive damages was improper.

We overrule issue four.

We affirm the trial court's judgment in part as to Heafner's breach of contract claim and the award of damages for loss of benefit of the bargain and attorney's fees. We reverse the trial court's judgment in part as to Heafner's causes of action for fraud and violations of the DTPA and her entitlement to consequential damages and punitive damages, and we render judgment that Heafner take nothing against Frost on her causes of action for fraud and violations of the DTPA. We remand the cause to the trial court for the sole purpose of calculating prejudgment interest on the award of damages for loss of benefit of the bargain.