COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-260-CV

 

 

CMS ENERGY
RESOURCE                                                     APPELLANT

MANAGEMENT COMPANY                                               AND
APPELLEE

F/K/A CMS MARKETING
SERVICES 

AND TRADING COMPANY

                                                   V.

 

QUICKSILVER RESOURCES, INC.                                              APPELLEE

                                                                                 AND
APPELLANT



 

                                              ------------

 

           FROM THE 236TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  INTRODUCTION








Quicksilver Resources, Inc. (Quicksilver) sued
CMS Energy Resource Management Company f/k/a CMS Marketing Services and Trading
Company (CMS) for breach of a long-term contract for the sale of natural gas,
for rescission, and for fraud in the inducement of that contract.  Following a two-week trial, a jury
deliberated for five days and returned a verdict.  Both Quicksilver and CMS moved for judgment
on the verdict; ultimately, the trial court signed a judgment for Quicksilver
and rescinded the long-term contract, effective from the date of the
judgment.  Both CMS and Quicksilver have
perfected appeals from the trial court=s
judgment.








CMS raises four issues.  First, CMS claims that there is legally
insufficient evidence to support the jury=s
finding that it fraudulently induced Quicksilver into the transaction.  Second, CMS argues that Quicksilver did not
obtain the necessary jury findings to support rescission of the long-term
contract.  Third, CMS argues that, in any
event, rescission of the entire contract was improper when the contract
contained a severability clause.  And
fourth, CMS argues that the trial court erred by requiring CMS to post a bond
to secure the costs of Quicksilver=s
supersedeas bond.  Quicksilver, as
appellee, raises a Aconditional cross-point,@[2] arguing
that the jury=s award of zero damages on its
fraudulent inducement claim is against the great weight and preponderance of
the evidence.  Quicksilver, as
cross-appellant, raises two issues: 
first, that the trial court erred by only prospectively rescinding the
contract instead of granting rescission ab initio, and second, that the trial
court erred by disregarding the jury=s award
of $10 million dollars in exemplary damages.

For the reasons set forth below, we sustain CMS=s first
issue challenging the legal sufficiency of the evidence to support the jury=s
finding of fraudulent inducement. 
Because we hold that no evidence exists that CMS made a definitive
promise that induced Quicksilver into the contract, we reverse the trial court=s
judgment and render judgment that Quicksilver take nothing.

                          II.  FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 1999, CMS and Quicksilver engaged in
telephone negotiations that culminated in an agreement before the parties hung
up; CMS and Quicksilver agreed that Quicksilver would sell CMS natural gas at a
fixed price of $2.47/MMbtu for ten years. 
As is customary in the industry, the telephone negotiations and,
ultimately, the deal reached in the telephone conversation, was recorded.








The recorded March 26, 1999 telephone
conversation between the parties was played for the jury multiple times.  Marc Pauley, a CMS employee, initiated the
March 26, 1999 telephone conversation, speaking with Mike Ryan, a Quicksilver
product marketing manager.  Eventually,
Toby Darden, Quicksilver=s Chairman of the Board, and
Glenn Darden, Quicksilver=s Chief Executive Officer,
joined the call via speaker phone with Mike. 
Andy Coppola, CMS=s regional marketing manager,
and David Geyer, CMS=s vice president of risk
management joined the call via speaker phone with Marc Pauley.  Unbeknownst to the Quicksilver employees who
were participating in the phone conversation, CMS=s David
Geyer was having a concurrent conversation with Lee Lewis, a CMS risk manager,
who, in turn, was on the phone with someone at J. Aron & Co., a New York
bank; this trio was discussing a financial hedge concerning the Quicksilver
gas.

During the March 26, 1999 recorded telephone
conversation, CMS and Quicksilver discussed a Aupside
sharing provision.@ 
The CMS and Quicksilver parties=
conversation concerning the Aupside
sharing provision@ was as follows:

(Radio broadcast.)

Mike Ryan:         This
is Mike Ryan speaking.

Marc Pauley:       Mike, it=s Marc.

Mike Ryan:         Hey,
Marc.

Marc Pauley:       I lost you.

Mike Ryan:         Yeah,
I was kind of hearing B it was dead air there
and I thought maybe we got B maybe we already said what we needed to
say.  I didn=t know.

Marc Pauley:       Oh, I=m sorry.  I was just trying to get the three, five, and
seven while I had you on the line.

Mike Ryan:         Right.  Okay.

Marc Pauley:       Okay.  So B okay.  2.26 for the three-year.

Mike Ryan:         Okay.

Marc Pauley:       2.31 for the five-year, 2.35 for the seven-year.

Mike Ryan:         Okay.  And very close on the 2.47 for ten?

Marc Pauley:       I=m sorry?

Mike Ryan:         And
real close to 2.47?

Marc Pauley:       No, we=re there.  I got guys here with their hands around my
neck if I don=t close ten years at
2.47.








Mike Ryan:         Okay.

Marc Pauley:       We=ve been working on this
since 8:00 o=clock.

Mike Ryan:         Let
me put you on hold right now and try to get that.

Marc Pauley:       Okay.

(Radio conversation.)

Mike Ryan:         Marc?

Marc Pauley:       Yes, sir.

Mike Ryan:         I=ve got Glenn and Toby
Darden with us.

Marc Pauley:       All right.

Unidentified 

Speaker:             Hey,
Marc.  Hey, Marc.

Marc Pauley:       Hi, guys.

Toby Darden:      We=re going over this
pricing from Consumers.

Marc Pauley:       Hey, Glenn and Toby and Mike, you guys want to hang on?  I got a couple other people in the room, too,
with me.  Why don=t I just put you on the
speaker phone?  Guys, are you there?

Mike Ryan:         Yeah,
I can hear you.

Toby Darden:      We=re here.

Marc Pauley:       Okay.  I have Andy
Coppola and David Geyer in here with me, too. 
Go ahead.

Toby Darden:      Okay.  Marc and David B

Andrew 

Coppola:            Yeah,
David is the vice-president of Risk Management Group, guys; and he=s the one that=s kind of back-stopping
this whole thing and making sure that we=re getting some accurate pricing information.

Toby Darden:      Sure.  Well, let me just
go over where we think we should be, okay, and why we=re having some issues;
but we=d love to hear what you
have to say about it.  But it B it looks like the NYMEX
strip for ten years was about 2.39 to 2.40 without basis.  That=s what our numbers are coming in at, guys; and we=re checking them a lot of
places.  And so that means that your
basis is on the order of 6 cents or B 4 cents is what the offer was yesterday.

David Geyer:       (inaudible) 2.39 to 2.40.

Marc Pauley:       We=re just relaying your
feedback to somebody who=s getting the bid for us,
too. 








Mike Ryan:         Yeah,
those are bid prices.  Those aren=t asks B those aren=t even in the range.  They were on the B I mean, they were B they were the bid, you
know.

Toby Darden:      Now, one thing I also wanted to throw into this mix is with
Consumers, we have a little benefit B well, actually, with anyone we have a little
benefit in being able to deliver the gas through Beaver Creek down directly
into your service area and maybe build some additional capacity on your
existing system. 

Marc Pauley:       Well, this is B we=re talking about a City Gate deal anyway, right?

Toby Darden:      Right.  But anyone else
going to Consumers is going to pay a dime to go downstream, aren=t they?

Marc Pauley:       I=m not sure I follow.

Toby Darden:      Well, we are in the process of acquiring the Dow Beaver Creek
line.

Marc Pauley:       Right.

Toby Darden:      You=re aware of that?

Marc Pauley:       Yeah.

Toby Darden:      And there=s a transportation
component to get down to the Consumer area, isn=t there, on your part?

Andrew 

Coppola:            There may be.  It=s just to say this is B you=re probably proposing
something that may help on our utility better than it would help us in the
marketing group here, guys, in maybe we don=t B maybe we don=t understand that well enough to appreciate it. 

Toby Darden:      Yeah, okay.  Well, I can
see that.  I mean, it=s pretty new; and it=s hard to value.  But it doesn=t change the fact that we
seem to be substantially below where NYMEX plus even a reasonable basis for
Michigan gas would be.  

Marc Pauley:       What do you think the basis component ought to be?

Toby Darden:      Well, I mean, we=re just using if you use a 2.39 to 2.40 ten-year
strip for NYMEX.

Marc Pauley:       Right.

Toby Darden:      And a 10- to 11-cent basis.

Marc Pauley:       We were B so that=s a .49 versus .47.  So we=re 2 cents apart.








Toby Darden:      .49 to .50, but I didn=t say come in the B the rumor was you couldn=t get there.  You were still around 2.44, 2.45.

Marc Pauley:       The last call I made to Mike, which was probably ten minutes
ago and we=ve been on the line
since, was that we=d like to close the
ten-year at 2.47.  We=ve been working that all
morning.

Toby Darden:      Okay.  Well, I=m sorry.  I got part of it.

Marc Pauley:       Okay.

Marc Pauley:       Well, we=re still here. We=d like to do the
ten-year.

Andrew 

Coppola:            We=re not really putting a
big chunk on this, guys; and we=d just like you to realize that we=re trying to get you as
close as we go along and try to back to back this thing.  I agree with your numbers.  I think we looked at a pretty wide basis
market up here that probably was trading, in the last couple of days, maybe 11 2 at 16 on the paper side,
which would be equivalent to a 9 2 bid B 9 2, maybe 10 bid, on the physical index is where it
is.  I suspect the index is probably
going to get tighter but B so I think what we=re looking at here is
probably not any B any more than B or looking at making
anymore than a penny or a penny and a half on this deal.

Toby Darden:      Wouldn=t that make it about a
2.48 price?

Andrew 

Coppola:            No,
230 B well, now the Market is
moving, but I guess conceptually, yeah.

Toby Darden:      Well, why don=t we make it 2.48 and we=ll make a deal?

Andrew 

Coppola:            Let
me get a look at it right here because we=re going to fill this.  Hang on.

Toby Darden:      Okay.

Unidentified 

Speaker:             Hey,
guys.

Andrew 

Coppola:            Hello.  Hello.

Unidentified 

Speaker:     
       Yeah.

Andrew 








Coppola:            With
the risk we have laying this thing off, these guys are sitting pretty tight on
.47 being a fair price here. 

Marc Pauley:       That=s what they asked for.

Marc Pauley:       Just to recap, guys, this is a number that we=ve been working for you
for several days; and, you know, we=ve run these guys into the ground for the last
four hours at .47.  It was not a number
that we chose.  It was a number that we
were quoted by Mike, and I think Glenn reiterated it a couple of days ago.

Toby Darden:      And from the benefit of a newcomer in here trying to haggle the
(inaudible) B 

Glenn Darden:     How about 2.51, can we do that?

Andrew 

Coppola:            Let
me say, again, guys, we do B we do want this to be a win-win and we want you
to be happy with it and we want to feel comfortable with it.  Considering the business that we=re going to do in the
future, I hope that you understand we=re not trying to take a big gouge out of this.

Toby Darden:      I understand, guys.  It=s not B I mean, we=re talking about a penny;
and I=ve been through the
numbers on a penny on this size deal.  It=s not going to make us or
break us.  So B 

Andrew 

Coppola:            I
guess we feel the same way.  We=re not going to take a
lot of risk on this, but it=s something that=s pivotal and it=s something that we=d like to do because I
think it makes sense for all of us down the road.  And we=ve kind of crossed a lot of hurdles here this
morning, and I=m glad we=re all finally here
together.  If we=re this close, we=d love to be able to do
it. 

Toby Darden:      Well, let me ask you this: Can we have it deliverable off the
Beaver Creek system to Consumers?

Andrew

Coppola:            I
think we=ll B I think what we need is
we need MMbtus into Consumers.

Toby Darden:      Oh, okay.  But I mean,
can we have B it would help us on our
pipeline situation to have it deliverable off that Beaver Creek system. 

Andrew 

Coppola:            If
Consumers will accept the gas B








Toby Darden:      They will. 

Andrew 

Coppola:            I
don=t want to do anything
that B that B

Toby Darden:      Yeah, only if they will accept the gas.  Let=s say conditional upon accepting the gas B

Marc Pauley:       And maybe I should add one more piece.  I mean, if Mike Shore comes back or anybody
out of the group and says, ASure, for 2 2 percent fuel and a nickel you can do that,@ obviously B

Toby Darden:      That=s not going to work.  Yeah. 
We=re just talking about a
net number here.

Andrew 

Coppola:            And
that number B I think my concern is as
long as we get it into the Consumers B if you guys can give us flexibility down the
road and there=s money to be shared,
then we=d be happy to come back
to you and say, AGuys, over this ten-year
period, these logistics may change.@

Toby Darden:      Yeah, that=s right.

Andrew 

Coppola:            And
we=d be happy to come back
down the road and say, AIf we can save a nickel
somewhere, guys, we=ll share that with you.@

Glenn Darden:     I think the best thing we can do is talk to Mike.

Toby Darden:      Yeah.  That=s probably the best way
to approach it.  Now, to give you guys a
little background on another contract we=ve made, we have the ability on a peaking basis
to do things with the gas.  I don=t know if Mike=s talked to y=all about this.

Mike Ryan:         No,
I haven=t.

Toby Darden:      But basically there may be some opportunities for both of us to
use the supply on some of these wild fluctuations in price.

Andrew 

Coppola:            Oh,
absolutely.  And we=ll stand there B with your supply and we
have peaking ability ourselves with the balancing at Consumers, as you guys
know B

Unidentified 

Speaker:             You
bet.

Andrew 

Coppola:            B I think that there=s some great outside
opportunities here.








Toby Darden:      Yeah.  You guys got more
strength in the balancing side than we do.

Andrew 

Coppola:            Right.

Toby Darden:      And we might be able to find some markets, you know, on a
spiking week or day or a month in winter months or, who knows, summer months,
who knows what happens, but maybe to arbitrage the supply a little better price
B

Andrew 

Coppola:            No
question. 

Toby Darden:      Can we work out a 50-50 split on that?

Andrew 

Coppola:            Absolutely.  And I can=t B as those things come up, we can talk about any
up side that we derive by taking this supply to a higher priced market that has
an arbitrage play, absolutely.

Toby Darden:      Can we put some kind of general intent language or B you know, I know how
lawyers are.  So I know how that works B but some sort of
indication that we will both work towards the best use of the supply?

Andrew 

Coppola:            Absolutely.  The only thing we can=t guarantee is that
whenever an arbitrage opportunity comes up, that this supply will be dedicated
to that; and it=s only because that=s what we=re doing with a lot of
our other supply.

Toby Darden:      Right.  I understand
that, but if we mutually find a specific deal for this supply B

Andrew 

Coppola:            Oh,
absolutely.

Toby Darden:      Can we say something like that?

Andrew 

Coppola:            Yeah.  If we change this deal, whether it be
short-term or whether it even be, you know, a longer term period of time,
somewhere along the course of this ten-year period, we will agree to share that
with you folks, whether it B you know, whether you bring us the idea or we
bring you the idea.

Toby Darden:      That=s wonderful.  Well, if we can just kind of say that=s what our goal is for
everybody, we=re fine with that; and we=ll work a split with you
on any deal we come across, hopefully vice versa.








Andrew 

Coppola:            Fantastic.  I think there=s a lot of opportunities
as this market place changes.  We may be
moving this gas back into Wisconsin, guys.

Toby Darden:      Yeah, yeah, right.  You
know, and I think off the Beaver Creek system, but the truth is, we got to hook
the Great Lakes right there, too.

Andrew

Coppola:            Yeah.  And we have presence over at Dawn on the
other side.  We have another office on
the Canadian side.

Toby Darden:      Oh, great.

Andrew 

Coppola:            We
can do some arb work at Dawn.

Toby Darden:      Well, let=s just see what we can
do, and that=s wonderful.

Andrew 

Coppola:            Do
you B I know I don=t want to shove this back
at you; but I think Marc might even talk to Mike about maybe drafting up a
letter of intent.  The contract is going
to take a little while, I=m sure.

Glenn Darden:     I think we ought to certainly send a letter of confirmation.

Andrew 

Coppola:            That=s right.  At least a letter of confirmation subject to
the review of a contract, but we=re ready to go. 
We=re going to go ahead and
take a position here. 

Glenn Darden:     Do you guys want to draft that letter?

Andrew 

Coppola:            We
could.

Glenn Darden:     Why don=t you send us a letter of
confirmation?

Marc Pauley:       Okay.  All right.  Are we locking in at 2.47 for ten years,
then?

Toby Darden:      That=s right.

Marc Pauley:       Okay.  That=s MMbtus.

Toby Darden:      That=s MMbtus, yes.

Andrew 

Coppola:            Okay.

Andrew 

Coppola:            Sounds
fantastic, guys.  This is a great start.

Glenn Darden:     Hey, we look forward to the relationship.

Andrew 








Coppola:            Absolutely.  We=ll get that confirmation faxed out to y=all this afternoon.

 

At Quicksilver=s
request, CMS sent a March 29, 1999 transaction confirmation to Quicksilver,
confirming the terms of the agreement the parties had reached.  The March 29, 1999 confirmation letter
memorialized the upside sharing provision by providing under the term AOther@ that AQuicksilver
and CMS MST agree that if subject gas supply can be scheduled/delivered
(whether on spot short-term or long term basis) to derive additional value,
that the parties shall share in such additional revenue on a 50%-50% basis.@  Quicksilver signed and returned the
transaction confirmation, and in March 2000, approximately a year after the
deal was struck on the telephone, the parties executed a formal GISB contract[3]
and an addendum documenting their agreement. 
The GISB contract set forth the upside sharing provision in the exact
same language as the confirmation letter under the Aspecial
conditions@ box.








As natural gas prices rose, a dispute erupted
between CMS and Quicksilver concerning the specific Aupside
sharing provision@ that was  negotiated in the recorded March 26, 1999
telephone conversation, set forth in the transaction confirmation, and
ultimately, placed into the parties= GISB
contract.  In December 1999, Thad Shumway
of Quicksilver contacted Marc Pauley of CMS about the upside sharing provision
in the parties= agreement.  Marc agreed that CMS had an obligation to
perform and said that he might have more time after the first of the year to
explore opportunities.  Shumway continued
to make inquiries of CMS about its performance under the upside sharing
provision.  But CMS did not respond.  By the summer of 2000, both Marc Pauley and
Andy Coppola had left CMS=s employment.  Eventually, in November 2000, Quicksilver
filed suit. 

CMS and Quicksilver sharply disagreed on the
meaning of the upside sharing provision. 
CMS took the position that the provision meant that if either CMS or
Quicksilver became aware of opportunities to increase the value of the contract
by changing the delivery point of the gas or the volume of gas delivered and
the parties discussed this opportunity and mutually agreed to change the
delivery point or the volume of gas to capture such a benefit, then the parties
would split any change to the deal that allowed the parties to capture a
benefit.  Quicksilver took the position
that the provision was a Aprofit-sharing@
provision and required CMS to pay Quicksilver fifty percent of any amount over
$2.47 that CMS sold the gas for.













Quicksilver=s breach
of contract and fraud in the inducement claims against CMS proceeded to trial.[4]  The trial court=s charge
asked the jury nine questions.  The jury
found in question number 1 that CMS failed to comply with the parties=
contract but found in question number 1A that a condition precedent to CMS=s
obligation to perform had failed to occur. 
In question number 2, the jury found zero damages resulted from
Quicksilver=s loss of upside sharing revenue
in the past and future as a result of CMS=s
failure to comply with the agreement.  In
question number 3, the jury found that CMS fraudulently induced Quicksilver
into the transaction, and in question number 4, it found zero damages in the
past and in the future resulted from CMS=s fraudulent
inducement.  In question number 5, the
jury found by clear and convincing evidence that the harm to Quicksilver
resulted from fraudulent inducement, and in question number 6, the jury awarded
$10 million dollars in exemplary damages. 
The jury did not answer questions 7, 8, 9, or 10[5]
because those questions were conditioned on answers contrary to the jury=s actual
answers.

The trial court signed a judgment for Quicksilver
on the jury=s verdict.  The judgment states that CMS fraudulently
induced Quicksilver into signing the GISB dated March 1, 1999, and orders that
the contract Ais rendered void as of the date
of this Judgment and is hereby rescinded.@  The judgment taxes costs against CMS.

              III.  LEGALLY INSUFFICIENT EVIDENCE
OF FRAUDULENT INDUCEMENT

In its first issue, CMS claims that there is
legally insufficient evidence to support the jury=s
finding of fraudulent inducement in question number 3.  Question number 3 asked:

Did CMS commit fraud
against Quicksilver?

 

Fraud
occurs when:

 

a.      a
party makes a material misrepresentation;

 








b.     the
misrepresentation is made with knowledge of its falsity or made recklessly
without any knowledge of the truth and as a positive assertion;

 

c.      the
misrepresentation is made with the intention that it should be acted on by the
other party; and

 

d.     the
other party reasonably relies on the misrepresentation and thereby suffers
injury.

 

AMisrepresentation@ means:

 

a.      a
false statement of fact; or

 

b.     a
promise of future performance made with an intent, at the time the promise is
made, not to perform as promised.

 

Answer
AYes@ or ANo.@

 

ANSWER:   Yes       


 

                                     A.  Which Law Applies








Before we begin our legal sufficiency review of
the evidence, we must determine which law applies here.  CMS contends that Michigan law defines the
elements of Quicksilver=s fraud claim because a
choice-of-law provision in the GISB contract and its addendum selects Michigan
law.  CMS argues, however, that Texas law
governs the procedure of the case, A[w]hile
Michigan substantive law determine[s] what facts Quicksilver must prove
to establish the elements of fraud, Texas procedure law governs how the
facts are proved.@ 
Quicksilver argues that Texas law applies substantively and procedurally
because (1) CMS does not point to Michigan law as requiring any different
element of fraudulent inducement not otherwise required under Texas law; (2)
CMS does not identify any way that the application of Michigan law would lead
to a different result than the application of Texas law; (3) the choice-of-law
provision in the GISB applies, if at all, only Ato
govern the Contract,@ not to extracontractual tort
claims; and (4) in any event, the award of partial rescission is simply a
matter of election of remedies, which is governed by Texas procedural law.








 Before
undertaking a choice-of-law analysis, we look to whether a conflict of law
exists.  Sonat Exploration Co. v. Cudd
Pressure Control, Inc., 271 S.W.3d 228, 231 (Tex. 2008); Fraud‑Tech,
Inc. v. Choicepoint, Inc., 102 S.W.3d 366, 377 & n.32 (Tex. App.CFort
Worth 2003, pet. denied) (citing Duncan v. Cessna Aircraft Co., 665
S.W.2d 414, 419 (Tex. 1984) (determining that, before undertaking choice of law
analysis, the court Amust first determine whether
there is a difference between the rules of Texas and New Mexico on this issue@), Young
Ref. Corp. v. Pennzoil Co., 46 S.W.3d 380, 385 (Tex. App.CHouston
[1st Dist.] 2001, pet. denied) (finding no necessity to decide which state=s law
applied absent a conflict of law on the issues presented), and St. Paul
Surplus Lines Ins. Co. v. Geo Pipe Co., 25 S.W.3d 900, 903 n.2 (Tex. App.CHouston
[1st Dist.] 2000, no pet.) (op. on reh=g) (AIn the
absence of a true conflict of law, we do not undertake choice of law analysis.@)).  If no conflict of law exists on the issues,
we need not decide which state=s law
applies.  Fraud‑Tech, Inc.,
102 S.W.3d at 377B78 & n.33 (citing Young
Ref. Corp., 46 S.W.3d at 385 and St. Paul Surplus Lines Ins. Co., 25
S.W.3d at 903 n.2).








In its brief, CMS sets out the elements that it
contends are required to establish fraud related to an agreement between the
parties, i.e., fraudulent inducement, under Michigan law.  The elements of fraudulent inducement under
Michigan law are essentially the same as the elements required under Texas
law.  Compare Belle Isle Grill Corp.
v. City of Detroit, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003) (setting
forth elements of fraudulent inducement under Michigan law) with In
re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001) (orig. proceeding)
(setting forth elements of fraudulent inducement under Texas law).  The trial court=s charge
in this case in question number 3 submitting fraud relating to an agreement
between the parties constitutes a proper submission of fraudulent inducement
under either Michigan or Texas law.  See
Custom Data Solutions, Inc. v. Preferred Capital, Inc., 733 N.W.2d 102, 105
(Mich. Ct. App. 2006); In re FirstMerit Bank, N.A., 52 S.W.3d at
758.  Consequently, because no conflict
of law exists on the elements of fraud relating to an agreement between the
partiesCthat is,
the elements of fraudulent inducementCwe need
not undertake a choice-of-law analysis. 
We apply Texas law to this issue.

                                     B.  Standard of Review








We will sustain a legal sufficiency challenge only
when (1) the record discloses a complete absence of evidence of a vital fact,
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (4) the evidence
establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362B63
(1960).  In determining whether there is
legally sufficient evidence to support the finding under review, we must
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that its finding was true.  Diamond Shamrock Ref. Co. v. Hall, 168
S.W.3d 164, 170 (Tex. 2005); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607,
627 (Tex. 2004).  We must review all the
evidence in the light most favorable to the finding.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  This means that we
must assume that the factfinder resolved any disputed facts in favor of its
finding if a reasonable factfinder could have done so.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  We must also
disregard all evidence that a reasonable factfinder could have
disbelieved.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627.  We
must consider, however, undisputed evidence even if it is contrary to the
finding.  City of Keller v. Wilson,
168 S.W.3d 802, 817 (Tex. 2005); Hall, 168 S.W.3d at 170.  That is, we must consider evidence favorable
to the finding if a reasonable factfinder could and disregard evidence contrary
to the finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete Co. Inc. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller, 168 S.W.3d at 807,
827.  More than a scintilla of evidence
exists if the evidence furnishes some reasonable basis for differing conclusions
by reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc.
v. Nat=l Union Fire Ins. Co. of
Pittsburg, PA, 77 S.W.3d 253, 262 (Tex. 2002).

           C.  The Law and Evidence Concerning Fraudulent
Inducement








CMS contends that no evidence exists that it made
a definitive promise, that is, an actionable misrepresentation to induce
Quicksilver into the transaction.[6]  Quicksilver points to two categories of
allegedly actionable misrepresentations made by CMS:  (1) misrepresentations made in the March 26
telephone conversation and (2) the language of and inclusion of the upside
sharing provision in the transaction confirmation and the GISB contract.  We will discuss the alleged
misrepresentations in the March 26 telephone conversation first.

Concerning the March 26 telephone conversation,
Quicksilver points to the following as actionable misrepresentations made by
CMS:

$      That
opportunities would arise in which the gas could be used to take advantage of
wild fluctuation in price;

 

$      That
the parties would work out a 50/50 split on upside prices;

 

$      That CMS would work towards the best use
of the supply.

But an examination of the March 26 telephone conversation transcript
reveals that the words Awould arise@ and Aupside
prices@ were
not used by CMS.  The parties agreed in
the telephone conversation that

[I]f you guys can give us
flexibility down the road and there=s money to be shared, then [CMS would] be
happy to come back to you and say, AGuys, over this ten-year period, these logistics
may change.@

. . . .

If we [CMS] can save
[as opposed to make] a nickel somewhere, guys, we=ll share that with you.

. . . .

[By Quicksilver=s Toby Darden:] But,
basically, there may be [not would be] some opportunities for
both of us to use the supply on some of these wild fluctuations in price.








. . . .  

[By CMS=s Andy Coppola:] I think
that there are some great outside opportunities here.

. . . . 

[W]e [Quicksilver] might
be able to find some markets, you know, on a spiking week or day or month
in winter months or, who knows, summer months, who knows what happens,
but maybe to arbitrage the supply a little better price.

. . . . 

[By CMS=s Andy Coppola:] [A]s
those things come up, we can talk about any up side that we derive by taking
this supply to a higher priced market that has an arbitrage play, absolutely.

. . . . 

[By Quicksilver=s Toby Darden:] Can we
put some kind of general intent language . . . some sort of indication that we
will both work towards the best use of the supply?

. . . . 

[By CMS=s Andy Coppola:] If we
change this deal, whether it be short-term or whether it even be, you know,
a longer term period of time. . . we [CMS] will agree to share that with
you folks [at Quicksilver]. [Emphasis added.]

 

Thus, the first two misrepresentations Quicksilver alleges CMS made
during the March 26 telephone conversation are not supported by the record.








Concerning the third misrepresentation
Quicksilver claims CMS made during the March 26 telephone conversationCthat CMS
would work towards the best use of the supplyCthe
record reflects that what Quicksilver=s Toby
Darden actually requested is, ACan we
put some kind of general intent language or B you
know, I know how lawyers are.  So I know
how that works B but some sort of indication that
we will both work towards the best use of the supply?@  [Emphasis added.]  CMS=s Andy
Coppola responds, AAbsolutely.  The only thing we can=t
guarantee is that whenever an arbitrage opportunity comes up, that this supply
will be dedicated to that; and it=s only
because that=s what we=re doing
with a lot of our other supply.@  Thus, to the extent CMS promised to work
towards the best use of the supply, it was not an unqualified promise of future
performance of the type sufficient to constitute an actionable
misrepresentation.  See, e.g., Stiles
v. Mem=l Hermann Healthcare Sys., 213
S.W.3d 521, 530 (Tex. App.CHouston
[1st Dist.] 2007, pet. denied) (recognizing unqualified promise to pay medical
bills in exchange for release of negligence cause of action sufficient to
constitute misrepresentation supporting fraud action).

Indeed, the representations by both CMS and
Quicksilver in the March 26 phone conversation are akin to Atrade
talk,@ which
does not constitute an actionable misrepresentation and will not support a
fraudulent inducement claim.[7]  In one case alleging deception in inducing a
contract, the Eastland Court of Appeals explained,








There is another angle from which the testimony in
this case must be viewed.  On the whole,
we consider the statement of facts reflects quite a volume of immaterial
personal opinion and trade‑talk between these parties, each one sparring
for an advantage, and considering the matter from his own standpoint; but on
the whole we think it conclusively appears that the general tenor and statement
of these negotiations do not rise, or rather descend, to the level of
actionable fraud, warranting the cancellation sought.

Guitar Trust Estate v. Boyd, 120 S.W.2d 914, 919 (Tex. Civ.
App.CEastland
1938, no writ); see also 37 Am. Jur. 2d Fraud and Deceit ' 75
(2001) (explaining the general rule that trade talk will not be construed as
importing a representation upon which a charge of fraud may be based at least
where the parties deal at arm=s
length).








Quicksilver relies on Spoljaric v. Percival
Tours, Inc., 708 S.W.2d 432, 434B35 (Tex.
1986), for the proposition that a promise to do an act in the future with the
intention, design, and purpose of deceiving and with no intention of performing
the act may constitute actionable fraud. 
Quicksilver claims CMS made such a promise here.  In Spoljaric, however, the jury found
that AUpchurch
promised Spoljaric that a bonus plan would be implemented to pay Spoljaric a
bonus for improvements to Percival=s
financial condition.@ 
Id. at 434.  Here, question
number 3 did not ask the jury to find, and the jury did not find, any
specifically identified promise or misrepresentation by CMS.  We have reviewed the record extensively and
we cannot locate, nor does Quicksilver point to, any specific promise or
misrepresentation by CMS during the March 26 telephone conversation that is
definite enough, that is specific enough, that is not conditional, and that is
not mere trade talk so as to constitute an actionable misrepresentation to
support a claim for fraudulent inducement.[8]













In summary, the alleged telephone conversation
promises made by CMS are nothing more than if-then promises to consider
opportunities to change the terms of the contract to take advantage of
arbitrage plays in higher priced markets, to make a 50/50 split if Awe might
be able to find some markets, you know, on a spiking week or day or a month in
winter months or, who knows, summer months, who knows what happens, but maybe
to arbitrage the supply a little better price,@ and
that the parties would mutually work towards the best use of the supply.  CMS=s
if-then conditional, indefinite, speculative promises and trade talk will not
support a fraudulent inducement claim under the present facts.[9]  The representations were at best conditional.  See, e.g., Criswell v. European
Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 945 (Tex. 1990); Hohenberg
Bros. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976)
(explaining that A[w]hile no particular words are
necessary for the existence of a condition, such terms as >if,= >provided
that,= >on
condition that,= or some other phrase that
conditions performance, usually connote an intent for a condition rather than a
promise@); Ford
v. City State Bank of Palacios, 44 S.W.3d 121, 140 (Tex. App.CCorpus
Christi 2001, no pet.) (recognizing same principle); see also BCY Water
Supply Corp. v. Residential Inv., Inc., 170 S.W.3d 596, 603B04 (Tex.
App.CTyler
2005, pet. denied) (recognizing statement Aamounted
to no more than a conditional promise of future performance contingent on BCY=s
ownership of the property@);[10]
Airborne Freight Co. v.  C.R. Lee
Enter. Inc., 847 S.W.2d 289, 298 (Tex. App.CEl Paso
1992, writ denied) (holding verbal statement that Aif you
do your job, we will retain you as a delivery contractor@ was a
conditional promise).  The
representations were at best indefinite and speculative.  See, e.g., Transp. Ins. Co. v. Faircloth,
898 S.W.2d 269, 276 (Tex. 1995) (recognizing that Aan
expression of opinion about monetary value is not a representation of fact
which gives rise to an action for fraud@).  The representations were at worst mere trade
talk.  See, e.g., Prudential
Ins. Co. of Am. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 163 (Tex. 1995)
(holding representations that building was Asuperb,@ Asuper
fine,@ and Aone of
the finest little properties in the City of Austin@ were
not misrepresentations that would support a fraud action); Paull v. Capital
Res. Mgmt., Inc., 987 S.W.2d 214, 218B19 (Tex.
App.CAustin
1999, pet. denied) (holding statements that an investment was Alow risk@ and
would Aproduce
large revenues for a long time@ were
merely dealers= talk); see also Frost Nat=l Bank
v. Heafner, 12 S.W.3d 104, 112B14 (Tex.
App.CHouston
[1st Dist.] 1999, pet. denied) (holding facts purportedly constituting
misrepresentation lacked probative force sufficient to constitute basis of
legal inference of fraud).








The record reflects that no promise by CMS exists
in the recorded March 26 telephone conversation that constitutes a definitive
misrepresentation sufficient to support Quicksilver=s
fraudulent inducement claim.  And because
every person involved in the telephone conversation who testified at trial
agreed that the Adeal@ was
completed when the parties hung up the phone, no evidence exists of an
actionable misrepresentation that induced Quicksilver into the
transaction.  That is, considering the
evidence in the light most favorable to the verdict and indulging in every
reasonable inference that would support it, the proffered evidence on the
misrepresentation element of Quicksilver=s
fraudulent inducement claim does not rise to the level that would enable
reasonable and fair‑minded people to differ in their conclusions.  See City of Keller, 168 S.W.3d at
822.  The evidence here on the alleged
misrepresentations made by CMS in the March 26 telephone conversation, even
viewed in the light most favorable to the verdict, simply does not furnish any
basis for differing conclusions by reasonable minds about the existence of an
actionable misrepresentation.  See
Rocor Int=l , Inc., 77
S.W.3d at 262; Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 62 (Tex. 1983);
see also Frost Nat=l Bank, 12
S.W.3d at 112B14.  The actual words and phrases used by CMS in
the March 26 recorded telephone conversation are subject to but one reasonable
conclusion; they are at most conditional, indefinite, speculative promises or
mere trade talk and will not support an action for fraudulent inducement.








We next turn to the second category of
misrepresentations relied upon by Quicksilver. 
Quicksilver claims that CMS fraudulently induced it into the contract by
virtue of the promise set forth in the Aupside
sharing provision@ in the transaction confirmation
and the GISB contract.  We agree with
Quicksilver that the Aupside sharing provision@ set
forth in the confirmation transaction and the GISB contractCthat Aif subject
gas supply can be scheduled/delivered (whether on a spot short-term or long
term basis) to derive additional value, that the parties shall share in
such additional revenue on a 50%-50% basis,@Clends
itself better to Quicksilver=s
contention that CMS fraudulently induced Quicksilver into the contract by
agreeing with no intent to perform that every time during the ten-year contract
that CMS sold gas it had purchased from Quicksilver for more than $2.47 MMbtu
it would give fifty percent of sales price over $2.47 to Quicksilver.  [Emphasis added.]








Testimony at trial established that entities
engaged in the gas industry customarily record telephone conversations; the
parties did so here and agree that when they concluded their phone
conversation, they Ahad a deal.@[11]  Thus, any promise by CMS that would make it
responsible for inducing Quicksilver to enter into the contract necessarily
must have occurred during the recorded telephone negotiations.  See, e.g., Formosa Plastics Corp.
USA v. Presidio Eng=rs &
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998); 37 Am. Jur. 2d Fraud
and Deceit ' 106 (2001) (recognizing that
for tort of fraudulent inducement pertinent point in time is when
misrepresentation is made and relied upon to induce contract).[12]  That is, the language of the upside sharing
provision as set forth in the transaction confirmation and the GISB contract
could not have induced Quicksilver into the contract because it was not in
existence when the parties reached a deal and concluded their phone
conversation.  See Haase v. Glazner,
62 S.W.3d 795, 797B98 (Tex. 2001) (explaining the
distinction between the tort of fraud and the tort of fraudulent inducement and
noting that the tort of fraudulent inducement presupposes that
misrepresentation induced party to enter a contract).








Quicksilver brought a breach of contract claim
against CMS, specifically asserting that CMS had breached the contractual Aupside
sharing provision.@ 
The jury found that a condition precedent to CMS=s
performance had not yet occurred, apparently indicating that the jury accepted
CMS=s
construction of the Aupside sharing provision.@  While Quicksilver possessed a breach of
contract claim based on CMS=s alleged
failure to comply with the upside sharing provision set forth in the
transaction confirmation and the GISB contract, no fraudulent inducement claim
exists based on the language of the upside sharing provision because the
parties already Ahad a deal.@  See id.  The fact that CMS allegedly later did not
comply with the upside sharing provision it included in the transaction
confirmation and the in GISB contract may constitute a breach of contract, but
it did not fraudulently induce Quicksilver into the deal consummated at the
conclusion of the March 26 telephone conversation.

We sustain CMS=s first
issue.

                                      IV.  SUPERSEDEAS ISSUE

In its fourth issue, CMS complains that the trial
court abused its discretion by requiring CMS, as the judgment debtor, to post a
bond for the costs (bond premiums) Quicksilver incurred obtaining a supersedeas
bond required by the trial court. 
Because the trial court possessed discretion to fashion this type of
ruling concerning security for a judgment for something other than money or an
interest in property, we overrule CMS=s fourth
issue.  See Tex. R. App. P.
24.1(e), 24.2(a)(3). 

                                          V.  CONCLUSION








Having sustained CMS=s first
issue and overruled CMS=s fourth issue, we need not
address CMS=s other issues.  See Tex. R. App. P. 47.1 (requiring
appellate court to address only issues necessary to disposition).  We likewise need not address Quicksilver=s
conditional cross-point.  See id.  Because we have held that the evidence is
legally insufficient to support the jury=s
fraudulent inducement finding, we overrule the two issues raised by Quicksilver
as cross-appellant:  first, that the
trial court erred by only prospectively rescinding the contract instead of
granting rescission ab initio, and second, that the trial court erred by
disregarding the jury=s award of $10 million dollars
in exemplary damages.

We reverse the trial court=s
judgment and render judgment that Quicksilver take nothing.  See Tex. R. App. P. 43.2(c).

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DELIVERED:  June 25, 2009

 











[1]See Tex. R. App. P. 47.4.





[2]For ease of reference, we
use the same characterizations as the parties utilized in their briefs when
discussing their points and issues.





[3]GISB stands for AGas Industry Standards
Board.@  A GISB contract is a form contract that may
be utilized in the gas industry.





[4]The trial court
previously granted summary judgment for CMS; this court reversed the summary
judgment as to Quicksilver=s breach of contract and fraudulent inducement
claims.  See Quicksilver Res., Inc. v.
CMS Mktg. Servs. & Trading Co., No. 02-03-00251-CV, 2005 WL 182951, at
*2 (Tex. App.CFort Worth 2005, pet.
denied) (mem. op.).  Quicksilver=s live pleadings
characterize this claim as Afraud in the inducement,@ and Quicksilver labels
this claim as such in its appellate brief, stating, AThe jury found that CMS
fraudulently induced Quicksilver into a ten-year Contract for the sale of
natural gas.@





[5]Question number 7 asked
whether Quicksilver entered the contract as a result of a unilateral
mistake.  Question number 8 asked whether
there was a meeting of the minds between the parties when they entered into the
contract.  Question number 9 asked
whether Quicksilver notified CMS of its intent to rescind the contract within a
reasonable time. And question number 10 asked what the total amount of revenue
Quicksilver would have received for the gas would have been if the gas had not
been committed to the Contract, minus the revenue Quicksilver actually
received.





[6]We did not address this
issue in the parties= prior summary judgment
appeal because CMS did not assert it as a ground for summary judgment on
Quicksilver=s fraudulent inducement
claim.  See Quicksilver Res., Inc.,
2005 WL 182951, at *2 (explaining that CMS moved for summary judgment on
Quicksilver=s fraudulent inducement
claim only on the ground that CMS had conclusively negated the reliance element
of the tort).





[7]The March 26 telephone
conversation reflects quite a volume of immaterial personal opinion and Atrade talk@ between these
parties.  The record reflects that both
parties are experienced in the gas industry and possess equal bargaining
power.  Both Quicksilver=s and CMS=s representatives talk
about the strengths that their respective companies bring to the table.  Toby Darden touts Quicksilver=s abilities because it is
in the process of Aacquiring the Dow Beaver
Creek line@ and Ahas a hook into the Great
Lakes.@  Andy Coppola counters with CMS=s strength on the Abalancing side@ by virtue of CMS=s utility company.  The conversation is filled with this type of Atrade talk.@





[8]Quicksilver points to the
fact that CMS was negotiating hedges during the March 26 telephone conversation
as evidence of CMS=s intent not to perform
its telephone conversation promises to Quicksilver.  Be this as it may, whatever CMS=s intent, it does not
transform CMS=s telephone conversation
words into something they are not; for the reasons discussed above, CMS=s telephone conversation
words were mere trade talk and are not definite enough, specific enough, or
unconditional enough to constitute an actionable misrepresentation.





[9]Interestingly, we have
not located a Texas fraudulent inducement case where, as in this case, the
seller sues the buyer for fraudulently inducing him into a contract to sell.





[10]We recognize that some of
these cases involve negligent misrepresentation claims, which must be
predicated on a misrepresentation of existing fact.  But we include these cases to show that CMS=s alleged promises do not
qualify as an actionable misrepresentation under either definition of
misrepresentation contained in the trial court=s charge.





[11]Every person who
participated in the March 26 telephone conversation and testified at trial
testified that the parties had Aa deal@ before their March 26 telephone conversation
concluded.  Toby Darden testified that
CMS and Quicksilver Ahad a deal@ when they hung up the
phone.  Marc Pauley testified that CMS
and Quicksilver Ahad a deal@ when he hung up the
phone on March 26.  David Geyer testified
that CMS and Quicksilver Ahad a deal@ when they concluded the
March 26 telephone conversation.  Mike
Ryan testified that the deal was consummated over the telephone.  Andy Coppola testified that when he hung up
the phone on March 26, ACMS had a deal with
Quicksilver for the sale or purchase of this gas.@  Thus, this fact was conclusively established.





[12]While, in light of the
GISB contract=s merger provision, parol
evidence was not admissible to vary the terms of the written contract, the
parties= verbal negotiations that
culminated in a Adeal@ are determinative for
the tort of fraudulent inducement.  See,
e.g., Spoljaric, 708 S.W.2d at 434 (party=s intent determined at
time party made representation).