

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

———————————————

No. 06-11-00104-CV

———————————————

ALL AMERICAN SIDING & WINDOWS, INC.,
AND EAGLEONE FINANCIAL, INC., Appellants

V.

BANK OF AMERICA, NATIONAL ASSOCIATION, Appellee

On Appeal from the County Court at Law No. 5
Dallas County, Texas
Trial Court No. CC-09-08023-E

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

All American Siding & Windows, Inc. (AAS), and its affiliated company EagleOne Financial, Inc. (EagleOne), appeal a summary judgment entered[1] in favor of Bank of America, N.A. (Bank). AAS and EagleOne argue that the trial court erred in: (1) overruling the objections to the affidavit of corporate representative Ryan Evans in support of the Bank's summary judgment; (2) granting the Bank's motions for summary judgment; and (3) granting the Bank's motion for bench trial. We find no abuse of discretion in the overruling of objections to the affidavit, determine that traditional summary judgment based upon the Bank's affirmative defense was proper, find that the no-evidence summary judgment was properly granted, and overrule the point of error complaining of the order granting a bench trial as moot.

I. **Factual Background**

Affiliated companies and Bank customers AAS and EagleOne became "a victim of fraudulent checks drawn on the company's business bank accounts" in 2006. James R. Keehn, controller for AAS and EagleOne, and Linda Kirks, AAS and EagleOne's secretary and treasurer, conferred with "Brian Tokarz, Plaintiff's account manager at Bank of America, and other personnel of Bank of America" regarding fraud prevention options. According to Keehn, "Tokarz and the other Bank of America personnel represented that Bank of America would no

---

[1]Originally appealed to the Fifth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005). We are unaware of any conflict between precedent of the Fifth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

2

longer be responsible for any losses due to fraudulent checks if All American did not take steps to reduce the check fraud."

To reduce check fraud, the Bank recommended its "On-line Business Suite and Bank of America Direct modules." The online suite would allow AAS and EagleOne to view transaction activity and transfer funds between the company bank accounts on the Internet. Through utilization of a product called Positive Pay, AAS could "electronically transmit a daily check register of all checks issued by All American, and Bank of America would match the checks listed in the Positive Pay file and pay only those checks with an exact match." In order to set up and manage Positive Pay, AAS and EagleOne were required to use the America Direct module, a function used to monitor and process Positive Pay exceptions and payments due to EagleOne from its customers.

Keehn believed this was a "full service, internet based, banking management system." Keehn recited that "Tokarz and the other Bank of America personnel explained to us and assured us of all the secure benefits of . . . Direct module." Positive Pay was implemented in 2006 after new software used to implement the program was purchased through an approved provider. AAS and EagleOne also implemented the automated clearinghouse (ACH), which allowed for authorized originators to transfer funds to or from accounts by initiating entries sent through the online system as an alternative to wire transfers. To use the ACH and other online banking accounts, a party was required to use "the company ID, user ID, and user password." Evans also

explained that the Bank required a digital certificate to be installed on the browser from which the transactions were conducted to verify the browser as an authorized computer.

AAS and EagleOne "became victims of electronic banking fraud that began on September 10, 2008 and continued through September 12, 2008." On September 12, Keehn logged on to the business suite module to review bank account activity. AAS and EagleOne's second amended petition recited that Keehn found an unauthorized transfer on September 10 from AAS to EagleOne for $24,763.49, another transfer of $18,322.03 on September 11, and an ACH disbursement of $24,763.49 on September 11 from EagleOne. Keehn contacted Kirks and the Bank. Pursuant to the Bank's instructions, Keehn faxed a written report to the Bank's fraud department at 10:05 on September 12, 2008. Keehn was contacted by David Baker of TD North Bank's fraud department, who indicated he was investigating an incoming ACH transaction in the amount of $5,174.92 which was to be credited to the account of a TD North Bank customer who had placed an order to wire transfer the funds to Russia.

Keehn was initially told that the fraudulent transactions would be reimbursed. He claimed "[i]n a conference call with various Bank of America representatives and myself and Linda Kirks on September 24, 2008, Carrie O'Brien of Bank of America stated that she 'had seen the Trojan' malware that was responsible for the fraudulent transactions." The reimbursement was conditioned upon the Bank recovering the fraudulently taken funds from the receiving bank, although Keehn swore he was not aware of this condition.

4

Evans, vice president and treasury service manager in the global fraud prevention department, testified in a deposition that "[t]ypically Bank of America will not cover loss for commercial accounts" because "there's no governmental requirement to do so." Evans stated,

> [U]pon notification, Brian Tokarz contacted our ACH corporate returns who requested the client present in writing their statement that this was indeed fraudulent activity according to the client, and based on receipt of that, reverse those transactions. And that reversal is requesting those funds be returned to us from the receiving banks.

Evans stated, "As soon as those funds had been withdrawn, the chance for recovery was slim." After the results of a corporate investigation revealed that no funds were available, the initial reimbursements to AAS and EagleOne were reversed.

In their second amended petition, AAS and EagleOne claimed they had lost a total of $26,783.07. They sued the Bank for breach of "Contract/Deposit Agreement/On-Line Banking Agreement/Guaranty/Warranty," in failing to protect their accounts from the fraudulent bank transfers and in failing to reimburse them for the lost funds. AAS and EagleOne also alleged that the Bank "and Plaintiffs had an express agreement whereby [the Bank] agreed to reimburse Plaintiffs." DTPA, fraud, fraudulent inducement, negligence, and negligent misrepresentation claims were also lodged. AAS and EagleOne complained that the Bank promised its services were secure and that it made a host of promises on its website to that effect.

Based upon its Treasury Services Terms and Conditions and Deposit Agreement and Disclosures, the Bank moved for no-evidence and traditional summary judgments on its

5

affirmative defense under the Texas Business and Commerce Code. It also alleged AAS and EagleOne had waived its right to a trial by jury in these documents. The trial court granted the Bank's motion for bench trial, as well as its motions for summary judgment.

## II. The Trial Court Did Not Abuse Its Discretion in Overruling Objections to Evans' Affidavit

Evans' affidavit stated:

Plaintiffs agreed to the Security Procedures after refusing additional security options offered by Bank of America. . . . Plaintiffs expressly refuse[d] to sign up for Dual Administration. Plaintiffs also had the ability to add the Dual Authorization/Approval options to their account through their online access, which Plaintiffs never did.

. . . . Bank of America had no knowledge that the transactions were allegedly conducted by anyone other than Plaintiffs. At the time the alleged transactions occurred, Bank of America had no way to verify whether Plaintiffs' Security Procedures had been compromised. I explained this to Plaintiffs.

We review the trial court's evidentiary rulings for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). "A trial court 'abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *BMC Software Belgium*, *N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002).

AAS and EagleOne objected to the affidavit of Evans as a whole because "[h]e was not designated as an expert," "admitted that he was not a computer expert," and stated he was not "familiar with other bank's security policies" in his deposition. Thus, it appears that they believe his affidavit should not have been allowed due to a lack of designation and qualification.

6

However, Evans was designated as the Bank's corporate representative. He held the position of "Treasury Services Manager in the fraud monitoring team," was assigned to this case, was familiar with the Bank's security policies, and swore that the facts contained within the affidavit were within his personal knowledge as a result of his position with the Bank. Moreover, this objection to Evans' affidavit was contained within a response to the Bank's motion for summary judgment, which did not seek relief from the court relating to the affidavit and failed to specify what portions of the affidavit required expert testimony. We cannot say the trial court abused its discretion in overruling this objection to Evans' affidavit.

Next, AAS and EagleOne argued that paragraph three of the affidavit of this "interested witness" contained "conclusory statements regarding the security procedures that were in place and that the fraudulent transactions complained of by [AAS and EagleOne] were verified by [the Bank] using the security procedures."[2] That paragraph stated:

> The Security Procedures in place for the . . . online banking accounts at Bank of America required a party be logged in using the company ID, user ID, and user password before conducting any transactions. Additionally, Bank of America required a digital certificate, specific to that user, be installed on the browser from

[2] AAS and EagleOne claim that the affidavit referenced a missing exhibit and that it "only contains an acknowledgement and not a 'jurist.'" They also question Evans' personal knowledge of the facts contained in the affidavit since he "only comes onto the scene after the September 2009 fraudulent ACH transactions were reported," "does not authenticate or identify any of the purported signatures for AAS or EagleOne," the Treasury Services agreement is unsigned, "there is no evidence that the Treasury Services document attached Exhibit A3" "was the one that was in effect at the time of the . . . fraudulent ACH transactions," or "was the one that was actually delivered to AAS and EagleOne," and Exhibits A4, A5, and A6 were not attached to the affidavits. Our review of the record reveals these challenges were raised for the first time on appeal. Consequently, we decline to address these complaints, which were defects of form or were clarified further in the record through the affidavit of Dana Lee and inclusion of the exhibits. *See* TEX. R. APP. P. 33.1; *Brown v. Brown*, 145 S.W.3d 745, 751 (Tex. App.—Dallas 2004, pet. denied) (citing *Thompson v. Curtis*, 127 S.W.3d 446, 450 (Tex. App.—Dallas 2004, no pet.)).

7

which the transactions were conducted to verify the browser as an authorized computer (collectively the "Security Procedures"). The transactions Plaintiff reported as fraudulent were all verified by Bank of America using the Security Procedures, as shown on the Audit Log attached as Exhibit A5.

A conclusory statement is one that is not susceptible to being readily controverted and does not provide the underlying facts to support the conclusion. *See Eberstein v. Hunter*, 260 S.W.3d 626, 630 (Tex. App.—Dallas 2008, no pet.). Conclusory statements are not proper summary judgment proof. *Grotjohn Precise Connexiones Int'l*, *S.A. v. JEM Fin.*, *Inc.*, 12 S.W.3d 859, 867 (Tex. App.—Texarkana 2000, no pet.). The record reveals that the assertions in paragraph three of Evans' affidavit, which are factual recitations, were supported by the referenced audit log. The audit log, depicting activity on the dates of the fraudulent transactions, demonstrates that Keehn was assigned a user ID and password and that the digital certificate was being recorded by the bank.

We find the trial court properly overruled AAS and EagleOne's objections to this paragraph of the affidavit. We overrule AAS and EagleOne's first point of error.

## III. The Bank Was Entitled to Traditional Summary Judgment

### A. Standard of Review

Whether summary judgment is proper is a question of law that we review de novo. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). "The standard for reviewing a traditional motion for summary judgment is well established." *City of Clarksville v. Drilltech*, *Inc.*, 353 S.W.3d 183, 187 (Tex. App.—Texarkana 2011, no pet.) (citing *Sysco Food*

8

*Servs.*, *Inc. v. Trapnell*, 890 S.W.2d 796, 800 (Tex. 1994); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)).  Traditional summary judgment is proper if (1) there are no genuine issues of material fact, and (2) the movant is entitled to judgment as a matter of law.  Tᴇx. R. Cɪv. P. 166a(c).  "If the movant establishes the right to judgment, the burden shifts to the nonmovant to raise a fact issue that would preclude summary judgment."  *Virginia Indonesia Co. v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 907 (Tex. 1995).

"When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor."  *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003).  When the trial court does not specify on what basis it granted summary judgment, the appellant must argue that every ground in the summary judgment motion is erroneous.[3]  *Strather v. Dolgencorp of Tex.*, *Inc.*, 96 S.W.3d 420, 422–23 (Tex. App.—Texarkana 2002, no pet.) (citing *Star–Telegram*, *Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995); *Simmons v. Healthcare Ctrs. of Tex.*, *Inc.*, 55 S.W.3d 674, 680 (Tex. App.—Texarkana 2001, no pet.)).

### B.    The Bank Established Its Affirmative Defense as a Matter of Law

AAS and EagleOne alleged that the Bank breached its "deposit agreements, on-line banking agreements, guaranties, and warranties" by "failing to protect Plaintiffs' accounts from the fraudulent bank transfers described above and by failing to reimburse Plaintiffs for the lost

---

[3]The Bank also filed no-evidence motions for summary judgment.

9

funds." They filed claims under the Deceptive Trade Practices Act (DTPA), fraud, fraudulent inducement, negligence, and negligent misrepresentation claims as well.

Based upon "Keehn['s] uncontroverted testimony in his affidavit," AAS and EagleOne contend the trial court erred in granting the Bank's summary judgment. They complain that they were not informed that the Bank had a policy not to cover fraud losses for commercial accounts. They also argue that there "was an express agreement between the Bank and AAS/EagleOne which required the Bank to reimburse the fraudulently transferred funds."

Keehn's affidavit swore that EagleOne and AAS was unaware that it would be responsible for losses due to fraudulent ACH transactions or that the Bank had discretion whether to reimburse them. They were also uninformed that other customers had been victims of fraudulent ACH transactions, or that additional software was needed. Keehn testified that Bank of America warranted the online services would be safe and secure and that there was an oral agreement of reimbursement, which was not conditioned upon the Bank recovering the money from the receiving bank. Keehn also believed that the Bank allowed for another fraudulent transaction to occur while waiting for required paperwork prior to placing a hold on the account. "In a conference call with various Bank of America representatives and myself and Linda Kirks on September 24, 2008, Carrie O'Brien of Bank of America stated that she 'had seen the Trojan' malware that was responsible for the fraudulent transactions." Keehn further stated in his affidavit:

On May 2, 2008, an unauthorized Automated Clearing House debit transaction was posted to All American's disbursement account. At the direction of Brian Tokarz, All American notified Bank of America's Automated Clearing House Services-Corporate Returns, which advised us to set up Automated Clearing House Debit Blocks on the specific disbursement account of All American. Bank of America did not advise All American to set up similar Automated Clearing House Debit Blocks on the bank accounts of EagleOne with Bank of America.

The fraudulent transactions at issue related to the ACH services. Section 4A.202 of the Texas Business and Commerce Code, entitled "Authorized and Verified Payment Orders" states:

(b) If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure,[4] a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.

(c) Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated. A security procedure is deemed to be commercially reasonable if:

---

[4] "'Security procedure' means a procedure established by an agreement between a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication amending or cancelling a payment order is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication. A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar security devices. Comparison of a signature on a payment order or communication with an authorized specimen signature of the customer is not by itself a security procedure." TEX. BUS. & COM. CODE ANN. § 4A.201 (West 2002).

11

(1) the security procedure was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for the customer; and

(2) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer.

. . . .

(e) This section applies to amendments and cancellations of payment orders to the same extent it applies to payment orders.

TEX. BUS. & COM. CODE ANN. § 4A.201.

The contracts entered into between the Bank, AAS, and EagleOne guide the application of Section 4A.202 in this case. With respect to ACH transactions, the Treasury Services Terms and Conditions stated:

Each time you use a Service, you represent and warrant that, in view of your requirements, the Security Procedure is a satisfactory method of verifying the authenticity of Entries and Reversal/Deletion Requests. You agree we may act on any Entries or Reversal/Deletion Requests after we have verified its authenticity through use of the Security Procedure.

It was uncontroverted that the fraudulent transactions were completed through use of a company ID and password and were confirmed through the digital certificate. Evans averred that this method was the security procedure in place for AAS and EagleOne for ACH transactions. This factual assertion was not contested.

12

Also, Linda Kirks and president Ken Kirks signed an Authorization and Agreement for Treasury Services, which acknowledged that "[t]he Client has received and reviewed Bank of America's Treasury Services Terms and Conditions Booklet . . . and the Client agrees to adhere to the Booklet and any applicable User Documentation provided by Bank of America." The Treasury Services Terms and Conditions contained contractual limitations of liability, including the following:

> You have sole responsibility for determining the level of security you require and assessing the suitability of the security procedures for these Services. We have no duty to investigate the authenticity of any application, instruction or other communication you provide us using an Electronic Trade Service. Also, we have no liability to you for acting upon any application, amendment or other communication purportedly transmitted by you, even if such application, amendment or message:

- Contains inaccurate or erroneous information.

- Constitutes unauthorized or fraudulent use of an Electronic Trade Service.

- Includes instructions to pay money or otherwise debit or credit any account.

- Relates to the disposition of any money, securities, or documents . . . .

> . . . .

> We are authorized, but not obliged, to rely upon and act in accordance with any application, instruction, consent or other communication by fax or other electronic transmission (including without limitation any transmission by use of our Software or the Internet) received by us purporting to be a communication on your behalf without inquiry on our part as to the source of the transmission or the identity of the person purporting to send such communication. . . .

> . . . .

13

We are liable to you only for actual damages incurred as a direct result of our failure to exercise reasonable care in providing a Service.

. . . .

In no event will we be liable for any indirect . . . loss or damage, . . . even if advised of the possibility of such loss . . . .

We will not be responsible for the acts or omissions of . . . any other person. . . .

The agreement stated it could not be changed by oral agreement.   It provided:

NOTICE OF FINAL AGREEMENT.   THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

The Bank further specified:

We have no obligation to cancel or amend any Entry after we have received it.   If you send us a Reversal/Deletion Request and we are able to verify the authenticity of the Reversal/Deletion Request using the Security Procedure, we will make a reasonable effort to act on your Reversal/Deletion request.   We will not be liable to you if such Reversal/Deletion Request is not effected.   You agree to indemnify us in connection with any such Reversal/Deletion Request as provided by UCC 4A.

Kenneth Kirks and Linda Kirks also "acknowledge[d] and agree[d] that this account is and shall be governed by the terms and conditions set forth in the. . . . Deposit Agreement and Disclosures."   This document discussed the access ID and passcode system used for online banking.   It provided:

14

From time to time, originators that you authorize may send automated clearing house (ACH) credits or debits for your account. For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect. . . .

. . . .

Your role is extremely important in the prevention of wrongful use of your account. If you find that your records and ours disagree or if you suspect any problem or unauthorized activity on your account . . . call us immediately . . . . We may require written confirmation of your claim, including an affidavit signed by you on a form acceptable to us.

. . . .

You agree that we have a reasonable period of time to investigate the facts and circumstances surrounding any claimed loss and that we have no obligation to provisionally credit your account. Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit or the forgery, alteration or other unauthorized withdrawal, reduced in all cases by the amount of the loss that could have been avoided by your use of ordinary care.

. . . .

. . . . [W]e may receive ACH debits to your account from senders you previously authorized to debit your account. You may ask us to stop payment on a future ACH debit to your account if the item has not already been paid. . . .

. . . .

The ACH stop payment takes effect within three business days.

Applying Section 4A.202, the agreements above and Evans' affidavit outline that the Bank, AAS, and EagleOne agreed that the authenticity of ACH transactions were to be verified using an ID, passcode, and digital certificate verification. Ryan's affidavit stated that the Bank

15

"follow[ed] the guidelines of the Federal Financial Institutions Examination Council and requires multifactor authentication for its online banking customers, including Plaintiffs," thereby demonstrating commercial reasonableness of the security procedure.[5]

Evans' affidavit, in conjunction with the audit log, confirm that the "Bank . . . had no knowledge that the transactions were allegedly conducted by anyone other than Plaintiffs," thereby demonstrating acceptance of the payment in good faith according to the security procedures. AAS and EagleOne argue that the Bank "did not act in a reasonable manner or in good faith by not immediately stopping the ACH transactions when AAS/EagleOne notified the Bank." Keehn alleges in his affidavit, "Once I learned of the fraudulent ACH activity on September 12, 2008, I immediately contacted Bank of America. Instead of placing an immediate hold on everything, Bank of America required us to fill out paperwork to reverse the transactions." This affidavit does not allege that Keehn or any representative of AAS and EagleOne requested the Bank to place an "immediate hold on everything." "Good faith," as defined by the Business and Commerce Code, means "honesty in fact and the observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM. CODE ANN. § 1.201(b)(20) (West 2009). "[L]ack of good faith exists when a party has actual knowledge of facts that when acted on constitute a dishonest disregard of the contractual rights of another party." *Commercial Nat'l Bank of Beeville v. Batchelor*, 980 S.W.2d 750, 754 (Tex. App.—Corpus Christi 1998, no pet.). Here, there is no

---

[5]Evans' affidavit stated that AAS and EagleOne refused additional security procedures. Because they agreed in writing to be bound by the Deposit Agreement and Disclosures, there is an argument that security procedures were deemed commercially reasonable under Section 4A.202(c).

16

indication that a stop payment order as contemplated by the Treasury Services Terms and Conditions or the Deposit Agreement and Disclosures had been entered, or that the paperwork required to confirm a fraudulent transaction had been received such that the Bank would be charged with actual knowledge of the fraudulent activity. Because the Bank's actions were in accordance with the contracts, failure to immediately stop the ACH transactions would not constitute an absence of good faith as defined by Section 1.201(b)(20).

AAS and EagleOne also argue that they had an "express agreement" with the Bank whereby the Bank agreed to return the funds connected with the fraudulent transactions. They point out that the Bank did reimburse the accounts initially, but later reversed the reimbursement transactions and thereby breached the express agreement. The Bank contends that the original reimbursement was conditional and was based on the written agreement of the parties:

> Our payment of any debit Entry, returned credit Entry or credit Reversal is provisional until we receive final settlement for the Entry or Reversal. If final settlement is not received, we are entitled to a refund and we may charge your account for the amount previously credited.

Based on this portion of the agreement, together with the agreement previously recited, we find that the written agreement could not be contradicted by evidence of subsequent oral agreements. Thus, we overrule the contention that an oral "express agreement" to reimburse is available to AAS and EagleOne.

We find that the Bank's agreements with AAS and EagleOne, in conjunction with Ryan's affidavits, established their affirmative defense as a matter of law.

17

**IV. No-Evidence Motion Was Appropriate**

We also find that the Bank's no-evidence summary judgment was properly granted.

**A. Standard of Review**

"A no-evidence summary judgment is essentially a pretrial directed verdict." *Roberts v. Titus County Mem'l Hosp.*, 159 S.W.3d 764, 769 (Tex. App.—Texarkana 2005, pet. denied). Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Id.* (citing *Wal–Mart Stores*, *Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). We must determine whether AAS and EagleOne produced any evidence of probative force to raise a fact issue on the material questions presented. *Id.* (citing *Woodruff v. Wright*, 51 S.W.3d 727, 734 (Tex. App.—Texarkana 2001, pet. denied)). We consider all the evidence in the light most favorable to AAS and EagleOne, disregarding all contrary evidence and inferences. *Id.* (citing *Merrell Dow Pharms.*, *Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

A no-evidence summary judgment is improperly granted if the nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Havner*, 953 S.W.2d at 711).

**B. DTPA**

In its second amended petition, AAS and EagleOne argued that the Bank engaged in deceptive trade practices. The following is an excerpt of their petition:

> Also, in connection with its advertising and providing banking services to Plaintiffs, BOA made express and/or implied representations and warranties regarding these services. By allowing the fraudulent transfers of funds from Plaintiffs' accounts and by failing and/or refusing to reimburse Plaintiffs for the funds lost, BOA breached such representations and warranties. In addition to any liability BOA may have for breaching express and/or implied warranties under the common law, BOA's conduct also violates, *inter alia*, Sections 17.46(b)(5), (7), (9), (12), (20), (24) and 17.50 of the Texas Deceptive Trade Practices – Consumer Protection Act.

"The underlying purpose of the DTPA is to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty." *Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 111 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (citing TEX. BUS. & COM. CODE ANN. § 17.44).

AAS and EagleOne argue that the source of the injury is not due to failure to enforce the contract, but due to implied and express warranties and representations that the banking services were safe and secure. The Bank complains that AAS and EagleOne may not repackage a breach of contract claim into a violation of the DTPA claim.

As we have previously mentioned in *Canfield v. Bank One*, *Texas*, *N.A.*:

> The DTPA does not define the term "warranty." The act does not create any warranties; therefore, any warranty must be established independently of the act. Express warranties are imposed by the agreement of the parties to a contract. Implied warranties are created by operation of law and are grounded more in tort law than in contract law. Implied warranties are derived primarily from statute, although some have their origin in common law. The UCC is a statutory source of

19

implied warranties. The UCC imposes a number of warranties on customers and collecting banks in the payment process, but there is no warranty by a payer bank in favor of its customer. A bank's implied promise that it will not pay checks on an unauthorized signature is not a warranty, but only an implied term of the contract. A mere breach of contract is not a violation of the DTPA. The actions of [the Bank] in paying checks on an unauthorized signature do not constitute "false, misleading or deceptive acts or practices in the conduct of any trade or commerce.".
. .

An allegation of breach of contract, without more, does not constitute a false, misleading, or deceptive act in violation of the DTPA. Nonperformance under a contractual obligation does not equate to misrepresentation under the DTPA. If so, then every breach of contract would be converted to a DTPA claim.

51 S.W.3d 828, 838–39 (Tex. App.—Texarkana 2001, pet. denied) (internal citations omitted).

Also, *Crawford v. Ace Sign*, *Inc*., reminded that courts should look to the source of a defendant's duty to act and the nature of the remedy sought by the plaintiff in deciding whether a claim is a contract or DTPA action. 917 S.W.2d 12, 13 (Tex. 1996). In their brief, AAS and EagleOne argue "[b]y allowing the fraudulent transfers of funds from plaintiffs' accounts and by failing and/or refusing to reimburse plaintiffs for the funds lost, the Bank breached such representations and warranties in violation of Sections 17.46(b)(5), (7), (9), (12), (20), (24) and 17.50 of the DTPA." The nature of the remedy sought by AAS and EagleOne is the reimbursement of the stolen funds. The source of any duty requiring such a remedy in this case would either come from the written agreements between the parties or the alleged oral reimbursement agreement Keehn asserted. These are matters of contract.

20

As in *Crawford*, statements that the product was safe and secure,[6] assuming they were made, did not cause any harm. *Id.* at 14. "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Cont'l Dredging*, *Inc. v. De-Kaizered*, *Inc.*, 120 S.W.3d 380, 389–90 (Tex. App.—Texarkana 2003, pet. denied).

In this case, we find the trial court properly granted summary judgment in favor of the Bank with respect to AAS and EagleOne's DTPA claims. This point of error is overruled.

## C. Fraud/Fraudulent Inducement

AAS and EagleOne alleged that the Bank committed fraud and fraudulently induced them into agreeing to the written contracts. They claim the Bank represented that the online services would be "safe and secure," that the Bank had always reimbursed them for losses due to fraudulent transactions, and that the Bank told them to use their online services to avoid any further fraudulent activity and to receive reimbursement for fraudulent transactions. AAS and EagleOne argue that the Bank did not tell them the "dirty little secrets" that the Bank's policy was not to cover losses for commercial transactions, that it does not disclose the foregoing policy to its customers, and that it is a "business decision" not to cover fraud losses.

The elements of fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon

---

[6]We need not address whether this statement, if made, constituted puffing or opinion.

21

it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners*, *Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011) (quoting *Aquaplex*, *Inc. v. Rancho La Valencia*, *Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). To bring a claim for fraud in the inducement, a plaintiff must show the elements of fraud and must show that he or she has been fraudulently induced to enter into a binding agreement. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). AAS and EagleOne bore the burden to produce more than a scintilla of probative evidence to raise a genuine issue of material fact.

The summary judgment evidence cited by AAS and EagleOne is the following excerpt of Keehn's affidavit:

Bank of America represented and warranted that the online services would be "safe and secure."[7] And as stated above, Bank of America had always reimbursed All American and/or EagleOne for any losses due to any fraudulent transactions. And it was Bank of America who told us that we had to use their online services to avoid any further fraudulent activity (and to continue Bank of America's agreement, policy, and practice of reimbursing All American and EagleOne for any losses due to fraudulent activity). But for Bank of America's representations and warranties that its online services were safe and secure and if All American and EagleOne would have known the information that was not disclosed as stated in the immediately preceding paragraph, we would not have used Bank of America's online banking services.

---

[7]Keehn merely asserted that the Bank represented the product would be safe and secure, without indicating when this occurred, or what Bank representative made this statement. Although there were allegations in the pleadings that representations as to safety and security were made on the Bank's website, no evidence was introduced with respect to these allegations.

We do not believe AAS and EagleOne's evidence produces more than a scintilla of probative evidence that the Bank made material representations of fact knowing them to be false or asserting them recklessly without knowledge of their truth. Assuming, without deciding, that representations of safety and security could constitute material misrepresentations of fact, and even assuming falsity, no evidence suggests that the Bank was aware of any alleged falsity of the statement, or made the statement recklessly without knowledge of its truth. *See Heafner*, 12 S.W.3d at 112, 114 (finding insufficient evidence of intent where bank made statement that customer's money would be "safe and secure in the bank").

Further, there is no allegation or evidence that the Bank ever promised AAS and EagleOne that it would unconditionally reimburse any funds purportedly transferred without their consent if they used the suggested security programs. The fact that the Bank had previously reimbursed AAS and EagleOne for some transactions does not constitute material misrepresentations of fact.[8] Recommendations to use online banking to increase safety and security also do not constitute misrepresentations. The "secrets" concerning the policy of reimbursement for fraudulent transfers which the Bank allegedly failed to disclose cannot constitute a misrepresentation, as the policy was fully explained in the contract the parties entered.

---

[8]Moreover, the mere failure to perform a contract is not evidence of fraud. *See Heafner*, 12 S.W.3d at 112 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

23

We agree there is no evidence on relevant elements of fraud and fraudulent inducement claims.  This point of error is overruled.[9]

**V.      Point of Error Relating to the Granting of the Motion for Bench Trial is Moot**

The Treasury Services Terms and Conditions contained the following waiver:

[A]ny dispute or controversy that arises from an Electronic Funds Transfer Service will be decided by a judge without a jury in a United States of America federal or state court (except as you and we expressly agree otherwise in writing).  This means that in these instances you waive any right to a trial by jury in any action or proceeding and agree that such action or proceeding will be tried before a judge without a jury.

The Deposit Agreement and Disclosures also contained a similar waiver.  AAS and EagleOne complain that these purported waivers of jury trial were not entered into knowingly and voluntarily.

Because we have determined that the trial court's summary judgment was properly granted, we overrule AAS and EagleOne's last point of error as moot.

---

[9]We note that AAS and EagleOne also asserted claims of negligence/negligent misrepresentation in their petitions. However, they fail to address these claims in their appellate brief.

## VI.    Conclusion

We affirm the judgment of the trial court.


Jack Carter
Justice

Date Submitted:    March 13, 2012
Date Decided:     April 20, 2012